(No. 76907

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. FRANK WILLIAMS, Appellant.

*Opinion filed May 31, 1996.—Rehearing denied September 30, 1996.*

HARRISON, J., took no part.
FREEMAN and NICKELS, JJ., dissenting.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Jack O'Malley, State's Attorney, of Chicago (Arleen C. Anderson, Assistant Attorney General, of Chicago, and Renee Goldfarb and Janet Powers Doyle, Assistant State's Attorneys, of counsel), for the People.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Following a jury trial in the circuit court of Cook County, defendant, Frank Williams, was convicted of first degree murder (Ill. Rev. Stat. 1991, ch. 38, pars. 9—1(a)(1)), attempted murder (Ill. Rev. Stat. 1991, ch. 38, par. 8—4), and aggravated battery with a firearm (Ill. Rev. Stat. 1991, ch. 38, par. 12—4.2(a)). Defendant waived a jury for sentencing. The trial court found defendant eligible for the death penalty based on the statutory aggravating factor that the murder was committed in a cold, calculated, and premeditated manner. Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11). The trial court further found that there were no mitigating factors sufficient to preclude imposition of the death penalty. Accordingly, the trial court sentenced defendant to death. The trial court also sentenced defendant to concurrent 30-year sentences for attempted murder and aggravated battery with a firearm. Defendant's death sentence has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the following reasons, we affirm defendant's convictions and sentences.

## FACTS

On January 3, 1991, at approximately 6 p.m., Anthony Cole drove Michelle Brueckmann, Noel Garcia and Francisco Mashane to Michelle's house at 1312 South Maple in Berwyn, Illinois. Anthony and Michelle went into the house while Noel and Francisco remained in the car, which was double-parked in front of Michelle's house. Anthony testified that around 6:30 p.m., he and Michelle were leaving the house and walking toward the street, when defendant emerged from behind a van. Defendant screamed, "I told you I was going to kill you when I saw you together." Defendant then pointed a .38-caliber revolver at Anthony and shot him in his

left shoulder. Anthony fell to the ground. Anthony next saw defendant grab Michelle and heard a gunshot. Anthony witnessed Michelle fall to the ground. Anthony got up and ran. Defendant chased Anthony and shot him in the right shoulder. Anthony then ran into a building for help.

Noel Garcia confirmed Anthony's testimony. Garcia testified that, after defendant shot Anthony, defendant ran up behind Michelle, grabbed her hair and put the gun to her head. Defendant then shot Michelle in the head. Michelle fell to the ground. Next, Garcia saw Anthony get up and start running. Defendant ran after Anthony and shot him again.

Berwyn police officers Cladio Paolucci and Ronald Volanti responded to a call of shots fired in the 1300 block of South Maple in Berwyn. When they arrived at the scene at approximately 6:35 p.m., they saw Michelle lying on the parkway, bleeding profusely from the head with no apparent signs of life. The officers also found Anthony lying on the kitchen floor of an apartment next door. He was bleeding from the chest and shoulder. After talking to Anthony, Officer Paolucci made a radio dispatch indicating that the offender's name was Frank Williams, that he was a black male, approximately 6 feet, 2 inches tall, and 180 pounds.

Berwyn police detective Mark Cione obtained an arrest warrant for defendant that same night. After learning that defendant might be staying at a house at 5024 South Winchester in Chicago, Detective Cione and other police officers proceeded to that address. They arrived at that address around 3 a.m. on January 4, 1991. When they arrived, Detective Cione rang the bell and spoke with defendant's sister, Kimberly Alexander, who indicated that she had not seen defendant. She then gave the officers permission to enter the house to look for defendant. They found defendant in a storage area

in the attic. Detective Cione placed defendant under arrest and handcuffed him. After taking defendant to the backyard, Detective Cione conducted a patdown search of defendant and asked him if he had any guns, knives or needles on him. Defendant responded that he did not, but said that he had a gun in his coat located in the attic. Detective Cione radioed Officer Paolucci, who was still in the attic, and told him to look for a jacket with a gun in it. Officer Paolucci found a jacket lying in the corner of the storage area. A .38-caliber revolver containing a few live rounds was in the pocket. Defendant was then taken to the Berwyn police station.

Assistant State's Attorney Kathleen White testified that she arrived at the Berwyn police station around 5:30 a.m. on January 4, 1991, and spoke with defendant. Assistant State's Attorney White advised defendant of his *Miranda* rights and he indicated that he understood them. Defendant agreed to give an oral statement but he refused to sign anything. Defendant discussed what had happened on January 3, 1991. Defendant stated that he became upset when he saw his girlfriend Michelle with his friend Anthony at a shopping mall during the afternoon of January 3, 1991. Later that evening, defendant took a loaded .38-caliber revolver from his dresser and drove to Michelle's house. Defendant stated that he parked the car around the corner from Michelle's house and stood behind a tree and waited for Michelle to come out of the house. When Michelle and Anthony came out of the house, defendant emerged from behind the tree with a loaded gun in his hand. Defendant walked directly up to Anthony and shot him in the shoulder. Defendant then shot Michelle in the head. Anthony suddenly got up, and defendant shot him again in the shoulder. Defendant then fled.

Anthony Cole testified that he and defendant had known each other for about 15 years. According to

Anthony, defendant and Michelle had been engaged but had broken off their engagement in the summer of 1990. Anthony had dated Michelle for about one month before Michelle was shot. Anthony testified about a prior incident in which defendant threatened to kill Michelle and Anthony if he ever saw them together. On January 2, 1991, Anthony, defendant and Michelle were riding in Anthony's car. Defendant suddenly jumped over the seat with a large butcher knife and attempted to stab Anthony. Anthony was cut on his hand. Anthony and defendant jumped out of the car. While chasing Anthony around the car, defendant said, "I told you if I saw you together I would kill you." After both defendant and Anthony stopped running around the car, defendant went to open the passenger door. Anthony then ran to the police station for help. When he returned, Michelle came out of defendant's house crying hysterically with a cut on her hand. Anthony took Michelle to the hospital where she received stitches in her hand.

The State also presented the testimony of Donald Smith, a firearms examiner from the Illinois State Police. Smith examined the .38-caliber revolver recovered from defendant's jacket and the bullet that had been surgically removed from Cole. Smith concluded that the bullet could only have been fired from the gun recovered. Smith also testified that, from the single-action position, with the hammer cocked, the gun required $5^1/_2$ pounds of pressure on the trigger in order to fire. In the double-action position, with the hammer at rest, the gun required $13^1/_2$ pounds of pressure on the trigger in order to fire.

As a final matter, the State presented the testimony of Assistant Medical Examiner Nancy Jones, who performed an autopsy on the body of Michelle. Jones testified that Michelle died as a result of a gunshot wound to her head. The bullet went through Michelle's

head. The entrance wound measured about one-half inch in diameter and showed evidence of being a near contact range wound, meaning that the muzzle of the gun was very close to the body at the time the weapon was fired. This was further evidenced by charring or burning around the entrance wound. Jones determined that the muzzle of the gun was within an inch or less of Michelle's head when the gun was fired. Jones further observed a "graze" gunshot wound on the back of Michelle's left hand, indicating that Michelle's hand was in very close proximity to the muzzle of the weapon at the time the weapon was fired. Michelle's right hand also had gunpowder on the back of the thumb and wrist, indicating its close proximity to the weapon when fired.

After the State rested, defendant presented his case. Defendant's friend Darrio Ramirez testified that in December of 1990 defendant and Michelle were engaged to be married and he saw them together. Ramirez testified that he was with defendant at a shopping mall on January 3, 1991, but that he did not see Michelle and Anthony. Ramirez also testified that he saw Anthony at a laundromat the day after Anthony was released from the hospital. He asked Anthony what had happened the night of the shooting. Anthony told Ramirez that he tried to grab defendant's gun and it went off, with the bullet striking Michelle.

Defendant testified on his own behalf. At the outset of his testimony, defendant acknowledged that he was convicted of aggravated battery in 1986. Defendant then went on to explain that he, Michelle, Anthony, Darrio, Noel and Francisco were all "best of friends." He and Michelle became engaged in July of 1988, but their engagement ended in September of 1990. After the engagement was over, they continued to see one another. Defendant stated that around Christmas of 1990, he and Michelle exchanged gifts. He contended that he never really considered their relationship to be over.

Defendant next described the incidents that occurred on January 2 and 3, 1991. On January 2, 1991, Anthony went to defendant's house with Michelle in the car. Anthony approached defendant and told him that defendant's relationship with Michelle was over and Anthony was the "new guy in town." Michelle got out of the car and stood next to Anthony, telling Anthony to let it be. Anthony replied, "No. I'm going to show him what's up." Anthony then removed a switchblade or pocket knife from his pocket and pointed it at defendant. Defendant slapped the knife out of the way. When defendant slapped the knife away, it cut the palm of defendant's hand and then struck Michelle, cutting her left hand. Defendant and Michelle went into the house and defendant gave her a towel to wrap up her bleeding hand. The police came to defendant's house but did not arrest defendant. Michelle subsequently left with Anthony. Defendant denied ever pulling a butcher knife on Anthony and Michelle.

The next day, defendant went to the North Riverside shopping mall with Darrio Ramirez and Darrio's girlfriend, Christina Rodriguez. Defendant claimed that he did not see Michelle or Anthony at the mall that day. When defendant arrived home, his brother told him that Anthony had been there looking for him and that Anthony had a gun. Defendant then went to look for Anthony. Defendant took his gun with him "just in case" Anthony had a gun. Defendant, however, was unable to find Anthony. Defendant subsequently went to Michelle's house to pick up some of his belongings. While passing a police station, he removed his gun from the passenger seat of his car and he put it in the pocket of his jacket. When defendant arrived at Michelle's house, he saw her and Anthony leaving her house. Defendant approached Michelle and Michelle called him aside to talk to him. As he and Michelle were talking,

Anthony approached them. Anthony put his hand inside his jacket and said, "What's up?" Defendant put his hand in his pocket. Defendant did not threaten Anthony or Michelle. Defendant, however, was concerned that Anthony was going to pull out a gun, so defendant pulled out his gun and pointed it at Anthony. Although defendant cocked the gun, he claimed that he did not have his finger on the trigger. Defendant told Anthony, "Just let it be. Let it be." Suddenly Anthony swung his arm toward defendant and hit the gun. The gun discharged and a bullet struck Michelle. Michelle fell to the ground and defendant said to Anthony, "Look what you did." Anthony replied, "I'm out of here." Defendant responded, "Tony, don't run," and fired at Anthony. Anthony kept running, and defendant fired at him again.

Defendant then left and drove to his sister Kimberly Alexander's house. At some point, defendant took the bullets out of the gun. He threw three empty bullet casings into the street and left the other three in his jacket pocket. He parked the car at his sister's house, took off his jacket, and put the gun in the right hand pocket of the jacket. He laid the jacket on the front seat and got out of the car. Defendant then went up to the attic and cried. Around 3 a.m., the attic door flew open and several police officers entered the attic with their guns drawn. They told defendant to "freeze." The officers handcuffed his hands behind his back and led him down the stairs to the backyard. While in the backyard, Detective Cione asked defendant whether he had any needles, knives or guns on him. Defendant said "No." Detective Cione then searched him. According to defendant, he never told Detective Cione where the jacket and gun were located.

Defendant stated that he was then taken to the Berwyn police station, where he was fingerprinted and

photographed. Defendant stated that neither Detective Cione nor Assistant State's Attorney White read him his *Miranda* rights. Detective Cione asked defendant about the shooting several times, and defendant refused to talk about it. Defendant denied making any statement to Detective Cione or to Assistant State's Attorney White.

Defendant concluded his testimony by stating that on the day of the shooting, he still loved Michelle. He claimed that it was not his intent to confront Michelle and Anthony or to shoot anyone. Defendant testified that when Michelle was shot it was a "complete accident." After Michelle was shot, defendant shot twice at Anthony because he did not want him to run away.

After the defense rested, the State presented three rebuttal witnesses. First, Detective Cione discussed defendant's conversation with him at the Berwyn police station. After advising defendant of his *Miranda* rights, Detective Cione conducted an interview with defendant which occurred at 4 a.m. and lasted approximately one hour. Defendant told Detective Cione that he was standing behind a tree on January 3, 1991, as he saw Michelle and Anthony walk out of Michelle's house. He approached them and fired one shot at Anthony. Defendant stated that he then pointed the gun at Michelle's head and fired one shot. Defendant also fired a second shot at Anthony. Next, Assistant State's Attorney White testified that defendant never indicated to her that Anthony had hit defendant's hand, causing the gun to discharge accidentally and strike Michelle. Finally, Noel Garcia testified that he did not see Anthony strike defendant's hand, causing the gun to discharge against Michelle's head. Following the testimony of these rebuttal witnesses, the State read defendant's 1986 aggravated battery conviction into the record.

At the close of the evidence and arguments, the jury

returned verdicts finding defendant guilty of the first degree murder of Michelle, and of the attempted murder and aggravated battery with a firearm of Anthony. Having waived a sentencing jury before trial, defendant was sentenced by the trial judge. The trial judge found defendant eligible for the death penalty based upon the statutory aggravating factor that the murder had been committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan to take human life by unlawful means, and that defendant's conduct created a reasonable expectation that the death of a human being would result therefrom. Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11).

At the aggravation-mitigation phase of the death penalty hearing, the State presented the following evidence in aggravation. Noel Garcia recounted an incident in August of 1990. Following Garcia's date with Michelle, Garcia was driving around with defendant, Anthony and Darrio Ramirez. After dropping off Anthony, they drove to a dead-end street and drank beer for awhile. Defendant suddenly began to beat Garcia. Defendant tied him up, kicked him and punched him in the face. Defendant then broke a bottle and held it to Garcia's neck and said he was going to kill him because he had been with Michelle. Just as defendant was about to poke the broken bottle into Garcia's neck, Darrio stopped him. This incident left Garcia with a fractured nose.

The State next called Chicago police detective James Cornelison. Detective Cornelison testified that on August 22, 1985, defendant was arrested for the beating of Hermilio Allencastro. The victim was in a coma for approximately two weeks as a result of the beating. Defendant signed a written statement regarding this incident. In defendant's statement, he admitted punching the victim approximately 20 times in the chest and head,

and stomping on the victim's head about seven times. Defendant pled guilty to aggravated battery as a result of this incident and was sentenced to five years' imprisonment.

Dawn Juarez, Michelle's best friend, next testified in aggravation. Juarez testified that on October 4, 1990, she received a phone call from Michelle. Michelle indicated that she was having problems with defendant. When Juarez saw Michelle that day she had a black eye. Michelle explained that defendant had taken her to a forest preserve, pulled her out of the car and punched her. Defendant then put a gun to Michelle's head. Defendant told her the gun had one bullet in it. Defendant pulled the trigger, but the gun did not fire. Defendant then told Michelle that she was lucky that she did not have to die that day, but if he could not have her then no one else would have her. Juarez stated that she had previously seen bruises or marks on Michelle's body. Michelle told her that these bruises and marks had been caused by defendant when she had tried to break up with him.

Finally, the State presented the testimony of Michelle's mother, Cheryl Brueckmann. Brueckmann testified about a conversation she and Michelle had in September of 1990. Michelle told her that she was afraid of defendant because he had threatened to kill her. Brueckmann had previously noticed bruises and marks including a black eye on Michelle. During their conversation, Michelle also told her mother that all of the bruises she had seen previously had been caused by defendant.

The State concluded by offering into evidence a certified statement of defendant's 1986 conviction of aggravated battery, a written statement signed by defendant in that case, and photographs of the victim of that incident.

Defendant called a number of witnesses in mitigation. Defendant first called Dr. George Savarese, a licensed clinical social worker. Dr. Savarese testified about his psychosocial evaluation of defendant. A psychosocial evaluation is an attempt to understand the developmental history of an individual. Dr. Savarese testified that defendant's early childhood represents a very dysfunctional emotional development because there was poor attachment and bonding to his mother. Other social factors noted by Dr. Savarese included the lack of a father figure in defendant's life, defendant's biracial family, and the racial abuse he faced in his neighborhood which was primarily Caucasian. Dr. Savarese believed that the racial antagonism defendant faced while growing up resulted in low self-esteem and a need for belonging. Defendant also possessed a deep fear of rejection and abandonment, which became exaggerated in his relationship with Michelle. Dr. Savarese testified that defendant perceived the loss of Michelle to Anthony as rejection and betrayal of best friends. Dr. Savarese concluded that the murder of Michelle and attempted murder of Anthony resulted from an explosion of underlying rage.

Defendant's neighbor, Christine Hernandez, testified that she had known defendant since he was an infant. He was friendly and helpful and would often do odd jobs for her. Hernandez testified that she never had any problems with how defendant treated her or her family.

Yolanda Nerie, who had known defendant for eight or nine years, also testified in mitigation. Nerie stated that, during the year she had dated defendant, he was never violent toward her. Defendant never had any hard feelings about their relationship ending, and they remained friends after they had stopped dating.

Next, members of defendant's family testified in mitigation. Defendant's two sisters, Gwendolyn Webber and

Kimberly Alexander, testified that defendant was not treated well by people in his neighborhood because he was African-American. They further pointed out that defendant had a very good relationship with their children and with Michelle. Webber specifically stated that defendant never acted violently against Michelle. Defendant's mother, Janie Webber, confirmed that defendant and Michelle seemed to love each other. Moreover, they continued to see each other during the holidays in 1990. Defendant's mother also stated that, although defendant was a very loving son, she was not a very loving mother.

Finally, defendant elected to speak in allocution. Defendant apologized to Michelle's family for the "terrible accident," apologized to his own family, and concluded, "I am sorry. I wish it never happened." He also expressed his continued love for Michelle.

After considering evidence from both sides, the trial court found that there were no mitigating factors sufficient to preclude imposition of a death sentence. Accordingly, the trial court sentenced defendant to death for the murder of Michelle. The trial court also sentenced defendant to concurrent 30-year sentences for the attempted murder and aggravated battery with a firearm convictions. Defendant now appeals his convictions and death sentence.

## I. JURY SELECTION

### A.

#### Challenge for Cause

Defendant first argues that the trial judge committed reversible error by refusing to excuse for cause venire member Mark Posternack. Defendant claims that venireman Posternack should have been removed for cause because of his lack of impartiality. Defendant contends that Posternack's *voir dire* responses indicate

that he had a bias against guns. Because this case involved the use of a firearm, defendant urges, Posternack could not be impartial. Defendant also contends that Posternack should have been removed for cause because he expressed self-doubt concerning his ability to be impartial.

The *voir dire* of Posternack was conducted by the trial judge. Defendant's argument is based on the following exchange between the trial judge and Posternack:

"Q. Can you still be fair and impartial if picked to serve as a juror?

A. No.

Q. What do you mean, no?

A. I'm totally against guns. I hear about this all the time and I couldn't be fair if somebody had one.

Q. You're totally against guns. So what?

A. I don't think one should carry guns unless a police officer.

Q. You haven't heard any facts yet. How can you assume that somebody was carrying a gun?

A. I just don't think anyone should carry a gun unless they're a police officer.

Q. If you were picked to serve on this jury would you be fair and impartial?

A. I'd do my best.

Q. What do you mean, your best?

A. I would hear it out.

* * *

Q. Do you know of any reason why you cannot be fair and impartial if picked to serve in this case?

A. As I stated before.

Q. What is that?

A. Gun control, otherwise, yes.

Q. I don't know what you mean, gun control?

A. Like I said, I'm against guns, any crime with guns.

Q. In other words, if somebody—if they say somebody used a gun it's automatically a guilty, is that right?

A. Well, not automatically guilty but I would say I

would have a reasonable doubt why he was carrying a gun. Before, I would say he was guilty, I'd like to hear it out."

The determination of whether to excuse a potential juror for cause rests within the sound discretion of the trial judge. *People v. Seuffer*, 144 Ill. 2d 482, 502 (1991); *People v. Hyche*, 77 Ill. 2d 229, 239 (1979). In reviewing the trial judge's determination, the entire *voir dire* examination of the potential juror should be considered, as opposed to selected responses. *People v. Peeples*, 155 Ill. 2d 422, 462-63 (1993). Because the trial judge is in the best position to observe the potential juror's demeanor and ascertain the meaning of his or her remarks, the trial judge's determination will not be disturbed on review unless it is against the manifest weight of the evidence. *Peeples*, 155 Ill. 2d at 463, 466; *People v. Pasch*, 152 Ill. 2d 133, 168-69 (1992).

A venireperson should be removed for cause if his or her state of mind is such that one of the parties will not receive a fair and impartial trial with that venireperson as a juror. See *Peeples*, 155 Ill. 2d at 463; *People v. Cole*, 54 Ill. 2d 401, 413 (1973). Simply giving an equivocal response, however, will not require that a venireperson be excused for cause. See *People v. Hobley*, 159 Ill. 2d 272, 297 (1994); *Pasch*, 152 Ill. 2d at 169 (potential jurors did have some difficulty with insanity defense; however, they indicated they could consider the evidence as presented at trial and then make a determination on defendant's sanity); *People v. Johnson*, 149 Ill. 2d 118, 138 (1992) (absolute certainty is not required in a potential juror's responses). Rather, whether a venireperson can be impartial should be determined from the venireperson's entire *voir dire* examination.

In this case, when the entire *voir dire* examination of Posternack is reviewed, it is apparent that Posternack would base his decision on the law and the evidence regardless of his personal feelings. This is evi-

denced by the following statements by Posternack in response to the trial judge's questions:

"Q. Will you follow the law as propounded to you by the Court regardless of your own personal feelings?

A. Yes.

\* \* \*

Q. So before you made up your mind you would wait until you heard the whole situation, both sides?

A. Yes.

Q. Right, sir?

A. Yes.

Q. Now, if the People prove the defendant guilty beyond a reasonable doubt will you return a verdict of guilty?

A. Yes.

Q. If the People fail to prove the defendant guilty beyond a reasonable doubt will you return a verdict of not guilty?

A. Yes.

Q. You understand that you are to consider the testimony of a police officer in the same light as that of an ordinary citizen and give it no greater weight just because it comes from a police officer?

A. Yes.

Q. You also understand that the defendant is presumed to be innocent and does not have to offer any evidence and this presumption remains with him throughout the trial and is not overcome unless after your consideration of all the evidence you find that the State has proved the defendant guilty beyond a reasonable doubt?

A. Yes.

Q. You also understand that the defendant does not have to testify and if he fails to testify you can draw no inference from that?

A. Yes."

It is clear that Posternack's complete *voir dire* examination revealed him to be a person who possessed the essential qualifications to be a fair and impartial juror. See *People v. Zehr*, 103 Ill. 2d 472, 477 (1984). We therefore find that the trial judge's denial of defendant's

motion to excuse Posternack for cause was not against the manifest weight of the evidence. We note that defendant also contends that he was prejudiced because, as a result of the trial judge's refusal to remove Posternack for cause, he was forced to exercise a peremptory challenge against Posternack and was thereby later forced to accept an objectionable juror (Kenneth Vallon) after he had exhausted all of his peremptory challenges. In light of our holding that the trial judge properly refused to remove Posternack for cause, however, defendant's argument in this respect fails.

## B.

### *Batson* Claim

Defendant next argues that the trial judge erred in determining that defendant had failed to establish a *prima facie* case of purposeful discrimination in the prosecutor's use of a peremptory challenge under *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986).

The record demonstrates that 52 venirepersons were questioned during *voir dire*. The trial judge allowed each side 20 peremptory challenges during jury selection. The defense exercised all 20 of its challenges, the trial judge excused 14 potential jurors for cause, and the prosecution exercised two peremptory challenges against David Price and Harold Martin. The record suggests that Price was Caucasian and Martin was African-American. After the prosecution exercised a peremptory challenge to excuse Martin, the trial judge questioned John Sterba, a Caucasian venireman. The trial judge then asked if defense counsel and the State would accept the panel. At this time, defense counsel raised a *Batson* objection to the State's challenge of Martin and requested that the State offer a race-neutral explanation for excusing Martin.

In response, the prosecutor pointed out that defense counsel was asking the court to find a *prima facie* case of racial discrimination. The prosecutor noted that several other African-American venirepersons had been questioned and that Martin was the only African-American venireperson against whom the prosecution had exercised a peremptory challenge. The prosecutor then stated to the court:

"You saw he was a black man with red hair. You heard the answers to his questions, that he was not satisfied. I don't think we have to at this time come forward with any reasons why this was—this man was excluded. *** It is obvious why this person was excluded."

Defense counsel responded by attempting to compare Martin to Sterba, who was also not satisfied with the outcome of a criminal case. The State informed the trial judge that, at that point in the proceeding, the trial judge only had to determine whether a *prima facie* case had been established and did not need to compare Martin with Sterba. The trial judge agreed that defense counsel should only focus on Martin. After hearing further arguments, the trial judge ruled that defendant had not established a *prima facie* case of racial discrimination. It is this finding by the trial judge that defendant now challenges.

In *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986), the United States Supreme Court established a three-step process for evaluating a claim that the State has exercised its peremptory challenges in a racially discriminatory manner. First, the defendant must establish a *prima facie* case of purposeful discrimination in the selection of the jury. Once the defendant establishes a *prima facie* case, the burden shifts to the State to articulate a race-neutral reason for challenging each of the venirepersons in question. Finally, the trial judge must consider those explanations and determine whether the defendant has met his burden of

establishing purposeful discrimination. *Batson*, 476 U.S. at 96-98, 90 L. Ed. 2d at 87-89, 106 S. Ct. at 1723-24.

A *prima facie* showing of discrimination under *Batson* requires the defendant to demonstrate that relevant circumstances in the case raise an inference that the prosecutor exercised peremptory challenges to remove venirepersons based upon their race. *Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87-88, 106 S. Ct. at 1723; *People v. Wiley*, 156 Ill. 2d 464, 473 (1993). In determining whether a *prima facie* case of discriminatory jury selection has been established, the following relevant circumstances should be considered: (1) racial identity between the defendant and the excluded venirepersons; (2) a pattern of strikes against African-American venirepersons; (3) a disproportionate use of peremptory challenges against African-American venirepersons; (4) the level of African-American representation in the venire as compared to the jury; (5) the prosecutor's questions and statements during *voir dire* examination and while exercising peremptory challenges; (6) whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic; and (7) the race of the defendant, victim, and witnesses. *People v. Hudson*, 157 Ill. 2d 401, 426 (1993); *Wiley*, 156 Ill. 2d at 473-74; *People v. Andrews*, 146 Ill. 2d 413, 425-26 (1992). A trial judge's determination of whether a *prima facie* case has been shown will not be overturned unless it is against the manifest weight of the evidence. *Hudson*, 157 Ill. 2d at 426; *Peeples*, 155 Ill. 2d at 469.

Our review of the evidence in light of all the relevant circumstances reveals that a *prima facie* case of discrimination under *Batson* was not established. The trial court's ruling was not against the manifest weight of the evidence.

The first relevant circumstance is whether defen-

dant and the excluded venireperson share the same race. Here, defendant and Martin are both African-Americans. Although this circumstance is relevant, it is not dispositive in determining whether a *prima facie* case exists. See *Peeples*, 155 Ill. 2d at 470.

We next consider whether the evidence in this case establishes a pattern of strikes against African-American venirepersons by the prosecution. It has previously been held that a pattern of strikes is created "where the strikes affect members of a certain race to such a degree or with such a lack of apparent nonracial motivation that it suggests the possibility of racial motivation." *Andrews*, 146 Ill. 2d at 429. The record shows that the prosecution exercised one of two peremptory challenges against African-American venirepersons. We acknowledge that the exclusion of even one venireperson because of race is unconstitutional and violates *Batson* regardless of the number of African-Americans not excluded. *Peeples*, 155 Ill. 2d at 468; *Andrews*, 146 Ill. 2d at 434. Nevertheless, we find that the State's exercise of one peremptory challenge to exclude an African-American venireperson is not strongly suggestive of racial motivation and does not constitute a pattern of strikes against African-American venirepersons. See *Peeples*, 155 Ill. 2d at 470 (State's use of one out of eight peremptory challenges to exclude an African-American venireperson does not constitute a pattern of strikes against African-Americans). We further note that before exercising this challenge, the prosecutor challenged one Caucasian and accepted one African-American venireperson. Consequently, there appears no discernable racial pattern to the State's exercise of its peremptory challenges.

The next factor to be considered is whether there is a disproportionate use of peremptory challenges by the prosecution against African-American venirepersons.

Comparing the number of African-American and non-African-American venirepersons stricken by the State reveals whether the State used a disproportionate number of peremptory challenges to exclude African-Americans. *Andrews*, 146 Ill. 2d at 430. Here, the prosecutor challenged only one African-American venireperson and one Caucasian venireperson. This does not demonstrate a disproportionate use of peremptory challenges against African-Americans.

Next, we consider the level of African-American representation in the venire as compared to the jury. The record indicates that there was one African-American juror. On a jury of 12 persons where one is African-American, the level of African-American representation is 8.3%. Nevertheless, we cannot compare the level of African-American representation on the jury with that of the venire because the record does not indicate the number of African-Americans in the venire. See *Peeples*, 155 Ill. 2d at 472. The absence of evidence as to the level of African-American representation in the venire renders this factor neutral in the determination of a *prima facie* case. See *Andrews*, 146 Ill. 2d at 435.

The next relevant circumstance concerns the prosecutor's questions and statements during *voir dire* examination and while exercising peremptory challenges. In this case, the trial judge alone conducted *voir dire* and no statements were made by the prosecution when it exercised its peremptory challenge against Martin. However, in response to defendant's *Batson* objection, the prosecution stated that Martin "was a black man with red hair." Defendant insists that this statement evidences discriminatory intent. We disagree. This statement was merely descriptive and reminded the trial judge that defendant's *Batson* objection regarded Martin and not Sterba, whose *voir dire* examination immediately preceded defendant's *Batson* objection.

Another relevant circumstance in determining if a *prima facie* case of discrimination has been established is whether the excluded African-American venirepersons were a heterogeneous group sharing race as their only common characteristic. Here, the only excluded African-American venireperson was Martin. Because Martin was the only African-American venireperson excluded by the State, there is no excluded "group" within which to compare any nonracial characteristics. *Pasch*, 152 Ill. 2d at 164. Defendant, however, claims that also relevant to this factor is whether the excluded African-American venirepersons share any characteristic with the non-African-American jurors. See *Andrews*, 146 Ill. 2d at 431-32. Although we have considered the nonracial characteristics common to stricken African-American venirepersons and non-African-American jurors in assessing heterogeneity, we find that this consideration is not mandatory in every case. See *People v. Henderson*, 142 Ill. 2d 258, 290 (1990) (it is not the role of the court to search for possible similarities between stricken black and accepted white venirepersons). Here, when defense counsel attempted to compare Martin with Sterba, the Caucasian juror who also was not satisfied with the outcome of a criminal case, the trial judge instructed defense counsel to focus on Martin. Based on the foregoing, we find that this comparison was not required at this stage of the proceedings.

The final factor relevant to establishing a *prima facie* case of purposeful discrimination is the race of the defendant, the victim and the witnesses. We have held that the racial characteristics of a crime are important factors. *Andrews*, 146 Ill. 2d at 433. Although the record does not disclose the race of the witnesses, it does reveal that defendant is African-American and the victim was Caucasian. This factor may suggest an inference of

purposeful discrimination. See *Andrews*, 146 Ill. 2d at 433.

After considering all the relevant factors in this case, we find that a *prima facie* case of discrimination under *Batson* was not established. The only factors suggesting purposeful discrimination include the racial identity between defendant and the excluded venireperson and the interracial nature of the crime. All other factors tend to refute an inference of discrimination or weigh neutrally in the balance. Therefore, we conclude that the trial judge's determination that defendant failed to establish a *prima facie* case was not against the manifest weight of the evidence.

In closing, we note that the dissent asserts that the State offered explanations in response to the defendant's *Batson* claim so as to render the issue of whether the defendant had established a *prima facie* case of racial discrimination moot. This interpretation is belied by the record. As discussed above, the State's comments were merely descriptive. Moreover, the State informed the trial court that it was premature to give any explanation for excluding Martin. The trial judge ruled only on the *prima facie* issue, which is the first step of *Batson*. Given that the State did not offer any explanation for its peremptory challenge of Martin and that the trial judge did not proceed past the *prima facie* determination, we find that the *prima facie* issue is not moot.

## II. TRIAL ISSUES

### A.

### Exclusion of Evidence

Defendant claims that the trial judge erred in denying his motion to suppress his statement to the police, given at his sister's house, regarding the location of the gun because he had not yet received *Miranda* warnings at that time. Defendant contends that the gun and the

evidence obtained from the gun should also have been suppressed because it was recovered as a result of the statement.

At the hearing on defendant's motion to suppress, Detective Cione testified that on the morning of January 4, 1991, defendant was discovered in the attic of his sister's building. Defendant's sister, her husband and their four children lived on the first floor, while the building's landlord and his family lived on the second floor. After defendant was located in the attic, defendant was placed under arrest pursuant to a warrant. Defendant was then handcuffed and taken from the attic to the backyard, where Detective Cione conducted a patdown search for weapons. Detective Cione asked defendant whether he had any weapons, knives or needles on him. Detective Cione did not give defendant *Miranda* warnings prior to asking this question. Defendant responded that he did not have a weapon on him, but that a gun was in his coat in the attic. No other questions were asked of defendant at this time.

At the conclusion of the suppression hearing, the trial judge ruled that defendant's statement and the gun were admissible pursuant to the public safety exception enunciated in *New York v. Quarles*, 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626 (1984). In *Quarles*, police officers chased a suspected rapist who was armed with a gun into a supermarket. The officers apprehended the defendant and handcuffed him. During a patdown search, the officer discovered that the defendant was wearing an empty shoulder holster. The officer asked the defendant about the location of the gun. The defendant nodded toward some empty cartons and stated, "The gun is over there." When the defendant made this statement, he had not yet been given *Miranda* warnings.

The United States Supreme Court nevertheless held

that defendant's statement and the gun were admissible. The Court reached this holding by creating a public safety exception to the requirement of *Miranda* warnings prior to custodial interrogation. The Court established this limited exception because the presence of a gun in a public place posed a danger to public safety. The Court noted that an accomplice might make use of the gun or a customer or employee might later come upon it. *Quarles*, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. The Court reasoned that requiring the police to give the defendant *Miranda* warnings before asking the whereabouts of the gun might have deterred the defendant from responding and put the public at risk. *Quarles*, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632. Therefore, the Court concluded that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." *Quarles*, 467 U.S. at 657, 81 L. Ed. 2d at 558, 104 S. Ct. at 2632.

The public safety exception of *Quarles* applies to this case. Here, defendant was entitled to *Miranda* warnings because he was in custody and the police officer interrogated him. As noted in *Quarles*, police faced with an immediate threat to public safety may ask questions necessary to secure the safety of the public or themselves prior to issuing *Miranda* warnings. *Quarles*, 467 U.S. 649, 81 L. Ed. 2d 550, 104 S. Ct. 2626. The record reveals that the loaded gun was in the attic of a house occupied by two families. There were also police officers on the scene. These facts demonstrate that the concealed gun posed a threat to the safety of those individuals living in the building and the police officers on the scene. Under these circumstances, it is reasonable to find that Detective Cione was attempting to secure the safety of himself, his fellow officers, and in-

nocent persons in the area from immediate danger when he asked defendant whether he was carrying any weapons. Detective Cione did not ask defendant any other questions at that time. This indicates that Detective Cione's question was not designed to elicit testimonial evidence from defendant. Based upon the foregoing, we find that the public safety exception to *Miranda* warnings applies to defendant's statement. The trial judge did not err in denying defendant's motion to suppress this statement and the gun.

### B.

#### Improper Questioning by Trial Judge

Defendant charges that the trial judge acted improperly in asking him certain questions about the incident on January 2, 1991. Defendant assigns error to the following colloquy at the end of defense counsel's re-direct examination:

"THE COURT: For my own clarification, Mr. Williams, did you have the gun in your pocket or in your hand when he swung at you with the knife?

DEFENSE COUNSEL: Objection, Your Honor. There is no testimony about him having a knife when he had the gun.

THE COURT: I'm talking about Cole with the knife.

DEFENSE COUNSEL: That was the day before. That was a different incident.

THE COURT: That's what I'm talking about. I just want to know.

DEFENSE COUNSEL: I object to the Court asking any questions that's confusing to me.

THE COURT: Sir, you stated that you had a gun in your pocket?

DEFENDANT: Yes, sir.

THE COURT: You also stated that Anthony Cole had a knife in his hand?

DEFENDANT: That wasn't on the same day, sir.

THE COURT: You didn't have the gun in your pocket on that date?

DEFENDANT: No, sir."

Defendant argues that the foregoing questions denied him a fair trial because they impugned his credibility. Defendant points out that there was no evidence that a gun had been involved in the January 2, 1991, incident. By asking defendant where he carried the gun, defendant contends, the trial judge implied that defendant's testimony was not truthful. In addition, defendant claims that the trial judge's questions also implied that the judge believed defendant to be a very dangerous individual who was habitually armed with a handgun. Defendant insists that he was prejudiced by these questions and that he is therefore entitled to a new trial.

It is well established that a trial judge has the right to question witnesses in order to elicit the truth or to clarify issues which seem obscure. *People v. Nevitt*, 135 Ill. 2d 423, 456 (1990); *People v. Hooper*, 133 Ill. 2d 469, 495 (1989); *People v. Hopkins*, 29 Ill. 2d 260, 265-66 (1963); *People v. Palmer*, 27 Ill. 2d 311, 314 (1963). The trial judge's examination must be conducted in a fair and impartial manner, without indicating bias or prejudice against either party. *People v. Marino*, 414 Ill. 445, 450 (1953); *People v. Santucci*, 24 Ill. 2d 93, 98 (1962). Whether the trial judge's questioning is proper depends on the circumstances of each case and rests largely within the discretion of the trial court. *Nevitt*, 135 Ill. 2d at 456; *Palmer*, 27 Ill. 2d at 315.

The trial judge's questions in the present case did not violate these principles. It is apparent from the record that the trial judge was attempting to clarify what he considered to be confusing testimony. On direct examination, defendant testified that on January 2, 1991, Anthony pulled a knife out of his pocket and pointed it at defendant. Defendant then slapped the knife away, and it struck Michelle. Defendant also stated that as he slapped the knife away, he was cut on the palm of his right hand. Defendant subsequently testified about the

shooting incident at Michelle's house on January 3, 1991. Defendant stated that he had the gun in his pocket when he arrived at Michelle's house. According to defendant, Anthony put his hand in his jacket and defendant put his hand in his pocket. Defendant became paranoid that Anthony would pull out a gun so defendant pointed his gun at Anthony. Anthony then hit the gun and it went off and struck Michelle. On redirect examination, defendant demonstrated how Anthony swung at him when defendant had the gun. Defense counsel then asked, "And when he swung in that manner ... is that when he struck your hand?" and defendant replied, "Yes, sir." The trial judge apparently perceived the foregoing testimony to be confusing in light of defendant's earlier testimony that he had been struck on the hand the previous day when Anthony pulled a knife. The trial judge asked questions to clarify whether defendant had a gun in his hand on January 2, 1991. The judge's questions about the gun did not indicate a bias, prejudice or hostility against defendant. Neither did the judge imply that he found defendant to be not credible. Rather, the judge merely sought to clarify defendant's version of the incident. Under these circumstances, we conclude that the trial judge did not abuse his discretion by questioning defendant about the gun.

## C.

### Improper Impeachment

Defendant asserts that he is entitled to a new trial because the trial court committed reversible error in denying his motion to bar the State from impeaching his credibility with evidence of his 1986 conviction for aggravated battery. Defendant contends that his aggravated battery conviction had no bearing on his testimonial credibility. Instead, defendant protests, such

evidence was highly prejudicial because it suggested to the jury that defendant had a propensity for violent criminal behavior.

The rule governing the admission of prior convictions to impeach a witness' credibility has been examined by this court on a number of occasions. In *People v. Montgomery*, 47 Ill. 2d 510 (1971), this court provided trial courts with discretion to allow impeachment of a witness' testimonial credibility by admitting a prior conviction. *Montgomery*, 47 Ill. 2d at 515. More specifically, the *Montgomery* rule provided that, for the purpose of attacking a witness' credibility, evidence of a prior conviction is admissible only if (1) the crime was punishable by death or imprisonment in excess of one year; or (2) the crime involved dishonesty or false statement regardless of the punishment. In either case, however, the evidence is inadmissible if the judge determines that the probative value of the evidence of the crime is substantially outweighed by the danger of unfair prejudice. *Montgomery*, 47 Ill. 2d at 516. In addition, evidence of a conviction under this rule is inadmissible if a period of more than 10 years has elapsed since the date of conviction or release of the witness from confinement, whichever is later. *Montgomery*, 47 Ill. 2d at 516.

This court recently reexamined the *Montgomery* rule in *People v. Williams*, 161 Ill. 2d 1 (1994). In *Williams*, this court determined that the lower courts were mechanically applying the *Montgomery* rule to allow impeachment of a testifying defendant with virtually all types of prior felony convictions. *Williams*, 161 Ill. 2d at 38-39. This court was concerned with the lack of emphasis lower courts had placed on the third prong of the *Montgomery* rule, that is, the balancing test. We emphasized the importance of conducting the balancing test of probative value versus unfair prejudice before

admitting prior convictions for impeachment purposes. *Williams*, 161 Ill. 2d at 38-41.

Following this court's decision in *Williams*, there has been confusion in the appellate court regarding whether *Williams* modified or changed the rule established in *Montgomery*. See *People v. Bramlett*, 276 Ill. App. 3d 201 (1995); *People v. Elliot*, 274 Ill. App. 3d 901 (1995); *People v. Fomond*, 273 Ill. App. 3d 1053 (1995); *People v. Maxwell*, 272 Ill. App. 3d 57 (1995). We hold that *Williams* does not alter the three-prong rule set forth in *Montgomery*. Rather, this court in *Williams* was expressing concern about the indiscriminate admission of all prior felony convictions for impeachment purposes absent application of the critical balancing test mandated by *Montgomery*.

The defendant in *Williams* was on trial for murder, and the trial judge allowed the State to impeach the defendant with a prior conviction for voluntary manslaughter. In overruling the defendant's objection to the impeachment, the trial judge stated that the conviction was " 'of great probative value in a case of this nature,' " and, further, was " 'highly probative of the nature of the offense.' " *Williams*, 161 Ill. 2d at 40. The trial judge seemingly allowed the impeachment because the underlying offense demonstrated the defendant's propensity for violence. As this court explained:

"The court's references to 'a case of this nature' and 'the nature of the offense' indicate that the trial judge admitted the evidence of the prior homicide conviction as being probative of the issue of defendant's guilt of the charged offense of murder, rather than as bearing upon defendant's credibility as a witness." *Williams*, 161 Ill. 2d at 40.

To be sure, there is language in *Williams* to the effect that this court no longer approved of the common rationale that a witness' prior felony conviction may by itself evince disrespect for social order and therefore supply a proper basis for impeachment. *Williams*, 161

Ill. 2d at 39. It has been noted that this discussion in *Williams* could be construed as eliminating the first part of the *Montgomery* test, leaving as eligible grounds for impeachment only convictions for offenses that involve dishonesty or false statement and that thus qualify under the second part of *Montgomery*. See *Bramlett*, 276 Ill. App. 3d at 211-13 (Steigmann, J., specially concurring); *Fomond*, 273 Ill. App. 3d at 1068; *Maxwell*, 272 Ill. App. 3d at 61; see also M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 609.4, at 82-87 (Supp. 1996). We now wish to make clear our continued adherence to the three-part test set forth in *Montgomery*.

Turning to the facts of the present case, we find no error in the proceedings below. Contrary to the defendant's argument, there is no reason to suppose that the trial judge failed to weigh the probative value of the impeachment against its possible prejudicial effect. A review of the transcript shows that the judge was fully aware of the *Montgomery* standard and the balancing test it requires. The parties referred to the balancing test in their arguments to the judge on the question whether the defendant could be impeached with the earlier conviction. In similar circumstances, this court has declined to find error when the transcript makes clear that the trial judge was applying the *Montgomery* standard, even though the judge did not expressly articulate it (see *People v. Redd*, 135 Ill. 2d 252, 325-26 (1990)), and the same result must be reached here. Although the trial judge in this case did not explicitly state that he was balancing the opposing interests, there is no reason to suppose that he disregarded the familiar, well-established *Montgomery* standard in determining that the impeachment was proper.

## D.

### Trial Judge's Response to Jury Questions

During its deliberations, the jury sent two notes to the trial judge. Defendant now argues that the trial judge erred in the manner in which he responded to the jury's notes.

The first note requested the following: (1) the distance from which a gun could leave a burn mark on skin; (2) Assistant State's Attorney White's report; (3) a copy of defendant's 1986 arrest report; and (4) copies of the "other exhibits that were entered." In response to this note, the following exchange occurred between the trial judge and defense counsel:

"THE COURT: I am going to answer.

DEFENSE COUNSEL 1: Those are a series of questions.

THE COURT: You going to tell me how to answer?

DEFENSE COUNSEL 1: I'd like to read it.

THE COURT: Here, read it.

DEFENSE COUNSEL 1: Don't you think counsel has a right to read the questions?

THE COURT: Sure. You read them, but don't tell me what to do.

DEFENSE COUNSEL 1: The first question from Corn—

THE COURT: That is the name of one of the jurors.

DEFENSE COUNSEL 1: No, it is the medical examiner's how far for the gun to leave a burn mark? 2 Can we have the report that Kathy White wrote? 3 A copy of [defendant's] 1986 arrest report. Now in relationship to that one, I don't think they are talking about the certified copy.

THE COURT: I don't want to know what you think.

DEFENSE COUNSEL 1: Number 4, can we have copies of the other exhibits that were entered?

THE COURT: Did you read it?

DEFENSE COUNSEL 1: Yes. Now I will give my answers.

THE COURT: Please continue to deliberate. You have all of the exhibits and I am just going to say please

continue to deliberate. And I am going to mark this 7-14-93 and I am going to initial. Anything you want to put on there?

 DEFENSE COUNSEL 2: Yes, Judge today is the 13th.

 THE COURT: Anything you want to put on the record?

 DEFENSE COUNSEL 2: No."

Defendant challenges the trial judge's actions in responding to this note. Defendant contends that the trial judge conducted a *"de facto ex parte"* proceeding because the trial judge refused to allow defense counsel to participate in formulating a response to the jury's note. Because of the trial judge's improper actions, defendant insists, he was denied his sixth amendment right to counsel. The State responds that this argument is waived. The State points out that defense counsel neither made an objection at the time of the alleged error nor stated this reason as grounds for error in his post-trial motion. It is well established that both an objection at trial and a written post-trial motion raising the issue are necessary to preserve an alleged error for review. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Application of the waiver rule, however, is less rigid where the basis for the objection is the trial judge's conduct. *Nevitt*, 135 Ill. 2d at 455. We will address defendant's claim of alleged judicial impropriety.

Defendant relies on this court's decision in *People v. Childs*, 159 Ill. 2d 217 (1994), as support for his contention that the jury's requests were considered in a *"de facto ex parte"* proceeding. In *Childs*, the jury sent a note to the trial judge with a question regarding the instructions. The trial judge informed the prosecutors of the question and his response. However, the trial judge made no effort to contact defense counsel before answering the jury's note. This court in *Childs* noted that "a defendant has an absolute right to be informed of any jury question involving a question of law and to be given the opportunity to participate for his protection in

fashioning an appropriate response." *Childs*, 159 Ill. 2d at 234. The *Childs* court held that the defendant was denied that right because defense counsel was not consulted prior to the trial court's response to the jury's question and, therefore, defense counsel was not able to participate in the process of determining what would be an appropriate response. *Childs*, 159 Ill. 2d at 234.

The facts in this case are distinguishable from those in *Childs*. When the trial judge received the jury's note, he read the note on the record with both defense counsel and the State present. Defense counsel was able to make statements on the record. In fact, the trial judge gave defense counsel an open invitation to raise objections, stating, "Anything you want to put on the record?" Defense counsel responded, "No." Under these circumstances, we find that the trial judge did not conduct a "*de facto ex parte*" proceeding, and defendant was not deprived of his constitutional right to counsel.

In addition to the first note, the jury sent the trial judge a second note, which requested the following documents: (1) a transcript of defendant's testimony; (2) a transcript of Detective Cione's testimony; (3) Detective Cione's written report; (4) Assistant State's Attorney White's report; and (5) defendant's initialed report of his rights being read to him. The trial judge responded by informing the jury that it had been given all of the exhibits admitted into evidence, had heard sworn testimony of the witnesses, and to continue deliberations. Defendant charges that the trial judge erred in refusing to give the jury the items requested.

The State responds that defendant waived any error that may have occurred in the trial judge's response to the second note. It is the State's contention that defense counsel acquiesced in all but "the form of the court's answer" and failed to preserve this argument. We disagree. The record reveals that after reading the jury's

note, defense counsel asked the court to "attempt to get the testimony for them." Defense counsel also stated that he had no objection to giving the jury the requested *Miranda* form. It was only when the subject of the discussion changed from the substance of the jury's request to the wording of the response to the request that counsel objected to the "form of the court's answer." It is evident from defense counsel's responses that he sought to have the requested reports and transcripts provided to the jury. This is not a new argument raised for the first time on appeal. We, therefore, do not find defendant's argument waived.

Defendant maintains that the trial judge should have complied with the jury's request for Assistant State's Attorney White's report, Detective Cione's report, and defendant's initialed report acknowledging *Miranda* warnings. These items, however, were not admitted into evidence. Where documents have not been admitted into evidence, the trial judge is without discretion to provide them to the jury during deliberations. *People v. Johnson*, 146 Ill. 2d 109, 151 (1991); see also *People v. Bradley*, 220 Ill. App. 3d 890, 901-02 (1991). Because these documents were not admitted into evidence, the trial judge properly refused to give them to the jury.

Defendant further argues that the trial judge should have complied with the jury's request for transcripts of the testimony of Detective Cione and defendant. The determination of whether to grant or deny a jury's request to review transcripts of witnesses' testimony rests within the sound discretion of the trial court. *People v. Pierce*, 56 Ill. 2d 361, 364 (1974). Absent an abuse of that discretion, the trial court's determination will not be disturbed on review. *Pierce*, 56 Ill. 2d at 364; *People v. Franklin*, 135 Ill. 2d 78, 105 (1990); *People v. Olinger*, 112 Ill. 2d 324, 349 (1986). In the present case, the rec-

ord indicates that the trial judge invited arguments and objections from both sides. The trial judge listened to the arguments put forth, exercised his discretion, and determined that the best response was to tell the jurors that they had heard the sworn testimony of the witnesses, and that they should continue to deliberate. There is nothing in the record to indicate that the trial judge abused his discretion in denying the jury's request. We therefore find that the trial judge properly exercised his discretion in refusing to provide the requested transcripts to the jury.

## III. SENTENCING ISSUES

### A.

### Validity of Jury Waiver

Defendant charges that his death sentence must be vacated because his waiver of a jury for his capital sentencing hearing was invalid. Defendant asserts that his waiver of a jury for sentencing was not knowing and intelligent because the trial court did not advise him that one juror could prevent the imposition of a death sentence. This argument has already been considered and rejected by this court. *People v. Ramey*, 152 Ill. 2d 41, 59 (1992) (for a jury·waiver at a capital sentencing hearing to be knowing, intelligent, and voluntary, a defendant need not be expressly advised that the vote of a single juror will preclude imposition of the death penalty or that the decision of the jury to impose the death penalty must be unanimous); *People v. Thompkins*, 161 Ill. 2d 148, 178-79 (1994); *People v. Ruiz*, 132 Ill. 2d 1, 20-21 (1989).

There is no "fixed formula" that a court must recite prior to accepting a defendant's valid waiver of a jury at sentencing. *People v. Strickland*, 154 Ill. 2d 489, 517 (1992). Instead, we have held that it is sufficient for a valid jury waiver that the trial court explain to the de-

fendant that he is waiving the right to have a jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the judge alone. *People v. Wiley*, 165 Ill. 2d 259, 301 (1995); *Ramey*, 152 Ill. 2d at 59. Here, the trial judge explained to defendant that he was waiving his right to have the jury consider the capital sentencing issues and that the sentencing decision would, therefore, be made by the trial judge alone. Given these admonishments by the trial judge, we find the jury waiver to be valid. See *Ramey*, 152 Ill. 2d at 59.

## B.

### Eligibility

Defendant charges that his death sentence must be vacated because the sole aggravating factor relied on by the trial court to find eligibility is invalid. The trial court found defendant eligible for the death sentence pursuant to the aggravating factor set forth in section 9—1(b)(11) of the Criminal Code of 1961 (Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11)). Section 9—1(b)(11) provides that a statutory aggravating factor sufficient to make a defendant eligible for the death penalty exists if:

> "the murder was committed in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom." Ill. Rev. Stat. 1991, ch. 38, par. 9—1(b)(11).

Defendant asserts that section 9—1(b)(11) is unconstitutionally vague under the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV). More specifically, defendant suggests that the terms "cold, calculated and premeditated" are open to many interpretations. Defendant therefore contends that section 9—1(b)(11) must be given

a limiting construction to render it constitutional. Because the trial court here failed to apply a narrowing construction to section 9—1(b)(11), defendant claims, his death sentence is invalid.

This court has already rejected the argument that the term "cold, calculated and premeditated," as used in section 9—1(b)(11), is unconstitutionally vague. *People v. Johnson*, 154 Ill. 2d 356, 372-73 (1993). In that case, we found that the challenged terms provide adequate guidance for assessing death eligibility. *Johnson*, 154 Ill. 2d at 373. When considering the totality of the words used in section 9—1(b)(11), we find that they provide sufficient guidelines for the sentencer in determining eligibility. See *People v. Munson*, 171 Ill. 2d 158, 191 (1996). We therefore reaffirm our holding in *Johnson* that section 9—1(b)(11) is constitutionally valid.

In a related argument, defendant challenges the sufficiency of the evidence to establish his eligibility for the death penalty under section 9—1(b)(11). Defendant contends that the evidence failed to show that he committed the murder in a "cold, calculated and premeditated manner" as described in section 9—1(b)(11). It is defendant's contention that the murder occurred because of rage, which developed spontaneously at the scene. We disagree.

The evidence indicates that on the day before the murder, defendant attacked Michelle and Anthony with a butcher knife, and threatened to kill them if he ever saw them together. The following afternoon defendant became upset when he saw Michelle with Anthony at the shopping mall. Later that same day, defendant took a loaded .38-caliber revolver and drove to Michelle's house. When defendant arrived at Michelle's house, he parked the car around the corner and hid behind a tree and waited for Michelle to come out of the house. When Michelle and Anthony came out of the house, defendant

emerged from behind the tree, carrying the loaded gun, and walked directly up to Anthony and shot him in the left shoulder. As Anthony fell to the ground, defendant placed the gun within an inch of Michelle's head and shot her. Then, defendant shot Anthony in the right shoulder as Anthony attempted to run away.

These facts demonstrate that defendant's actions were not spontaneous. The sentencer could find that defendant murdered Michelle after much thought and reflection. Defendant had ample time for reflection the previous day after he threatened Michelle and Anthony and attacked them with a knife. Defendant had more time for reflection after he again saw Michelle and Anthony together at the mall the next afternoon. Defendant's actions in driving home and then proceeding to Michelle's house later that evening with a loaded gun show that defendant contemplated this murder well in advance. We find that this evidence supports the trial court's determination that defendant murdered Michelle in a cold, calculated and premeditated manner pursuant to a preconceived plan, scheme or design to take her life by unlawful means. Furthermore, defendant's conduct in shooting Michelle in the head at close range created a reasonable expectation that she would die. Thus, the evidence was sufficient to prove the existence of the aggravating factor set forth in section 9—1(b)(11).

## C.

### Denial of Continuance

Defendant asserts that the trial court abused its discretion when it denied defendant a continuance for the second stage of the sentencing hearing. Defendant insists that a continuance was warranted because he provided the trial court with specific information establishing that much of his investigation into mitigation was incomplete.

Following the trial court's finding of eligibility, defense counsel filed a motion requesting a continuance to allow Dr. George Savarese, defendant's mitigation specialist, additional time to complete his psychosocial evaluation of defendant. A psychosocial evaluation is an attempt to understand the developmental history of an individual. The trial court granted defendant a continuance from August 9, 1993, to September 27, 1993, approximately seven weeks. The trial court indicated to defense counsel that no further continuances would be allowed. On September 27, 1993, defense counsel filed an affidavit from Dr. Savarese stating that he was unable to complete his investigation. According to Dr. Savarese, there were remaining family members and friends to interview and additional documents to view. Defense counsel, however, did not request a second continuance. The sentencing hearing then proceeded.

Defendant argues that the trial court abused its discretion when it did not grant a continuance following defense counsel's filing of Dr. Savarese's affidavit. This court has held that the granting or denial of a continuance is a matter resting in the sound discretion of the trial judge, and a reviewing court will not interfere with that decision unless there has been a clear abuse of discretion. *People v. Gosier*, 145 Ill. 2d 127, 156-57 (1991); *People v. Collins*, 106 Ill. 2d 237, 281 (1985). Here, the record reveals that Dr. Savarese evaluated defendant's childhood, family history, health history, educational history, employment history, criminal and prison records. Despite a claim that the investigation was incomplete, Dr. Savarese was able to present his expert opinion regarding the cause of defendant's actions. Dr. Savarese found that the murder of Michelle and attempted murder of Anthony resulted from an explosion of underlying rage, following defendant's perceived rejection and betrayal by his best friends. In addition,

the defense presented further evidence in mitigation through the testimony of defendant's neighbor, defendant's former girlfriend, two of defendant's sisters, and defendant's mother. They provided testimony as to defendant's good character and difficult childhood. In light of the foregoing, it is evident that defense counsel provided substantial evidence in mitigation. Any further evidence would likely have been cumulative. Therefore, we find that the trial court did not abuse its discretion in denying any further continuances.

In a related argument, defendant argues that defense counsel was ineffective for failing to renew the request for a continuance after filing Dr. Savarese's affidavit. Given that we have found no abuse of discretion in the trial court's failure to grant a second continuance, defendant's argument fails.

### D.

### Rebuttal Argument

Defendant contends that he was denied a fair sentencing hearing because the trial court permitted the State to argue in rebuttal at the aggravation-mitigation phase of the capital sentencing hearing. The trial judge has discretion to allow the State to present a rebuttal argument since the State is the moving party at the sentencing hearing. *People v. Williams*, 97 Ill. 2d 252, 302-03 (1983). This court's holding in *Williams* has been repeatedly reaffirmed. *People v. Tenner*, 157 Ill. 2d 341, 382 (1993); *People v. Page*, 155 Ill. 2d 232, 282-83 (1993); *People v. Caballero*, 102 Ill. 2d 23, 47-48 (1984). Defendant has not presented any compelling reason for this court to reconsider its prior decisions. We, therefore, reject defendant's argument.

### IV. CONSTITUTIONALITY OF THE ILLINOIS DEATH PENALTY STATUTE

In his final two arguments, defendant challenges the

constitutionality of the Illinois death penalty statute. We decline defendant's invitation to revisit the following arguments: (1) that the death penalty statute places a burden of proof on the defendant that precludes meaningful consideration of mitigation (*People v. Johnson*, 154 Ill. 2d 356, 373 (1993); *People v. Mitchell*, 152 Ill. 2d 274, 345-46 (1992); *People v. Bean*, 137 Ill. 2d 65, 138-40 (1990)); and (2) that the death penalty statute does not sufficiently minimize the risk of arbitrarily or capriciously imposed death sentences (*Tenner*, 157 Ill. 2d at 390; *People v. Whitehead*, 116 Ill. 2d 425, 465 (1987); *People v. Albanese*, 104 Ill. 2d 504, 541-42 (1984)). This court has previously considered and rejected these arguments. Defendant offers no persuasive reason for this court to reconsider its prior decisions.

Accordingly, we find no merit to defendant's challenges to the constitutionality of the Illinois death penalty statute.

## CONCLUSION

For the reasons set forth above, we affirm defendant's convictions and sentences. We direct the clerk of this court to enter an order setting Wednesday, September 18, 1996, as the date on which the sentence of death, entered by the circuit court of Cook County, shall be carried out. Defendant shall be executed in the manner provided by law. Ill. Rev. Stat. 1991, ch. 38, par. 119—5. The clerk of this court shall send a certified copy of this mandate to the Director of Corrections, to the warden of the Stateville Correctional Center, and to the warden of the institution where defendant is now confined.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.

JUSTICE FREEMAN, dissenting:

Under our sentencing scheme, the second phase of a death penalty hearing requires the jury or the court to weigh and balance any mitigating factors against the aggravating factors. *People v. Turner*, 156 Ill. 2d 354, 359 (1993). If there are no mitigating factors sufficient to preclude imposition of the death penalty, the court shall sentence the defendant to death. Ill. Rev. Stat. 1991, ch. 38, par. 9—1.

In this case, the trial court found no mitigation sufficient to preclude death. A majority of this court now affirms that sentence. I disagree. In *People v. Carlson*, 79 Ill. 2d 564 (1980), and *People v. Buggs*, 112 Ill. 2d 284 (1986), this court, finding that the trial court had not appropriately balanced the mitigation evidence, was prompted to reduce those defendants' death sentences to life imprisonment. The facts here, though different from those in *Carlson* and *Buggs*, give rise to the same kind of concerns. Thus, in my view, the same result which occurred in *Carlson* and in *Buggs* should obtain here.

In this case, the record reveals that the conduct which ultimately led to Michelle Brueckmann's death was triggered by defendant's loss of an exclusive romantic relationship with her. The record consistently demonstrates that the motivation behind this young defendant's violent conduct, from the time of his breakup with Michelle until her untimely death, was defendant's emotional inability to cope with the loss of that relationship. Significantly, the events, which occurred over the course of a four- to five-month period after the breakup, involved those people with whom defendant had previously enjoyed a close and lasting friendship.

A review of the evidence is illustrative. Defendant testified that he met Michelle in 1984. He was best friends with her, Anthony Cole, Darrio Ramirez and Noel Garcia.

In 1988 defendant and Michelle became engaged to be married. The engagement terminated around September 1990; however, according to defendant, the two continued to see each other. Defendant stated that he did not really consider their relationship as boyfriend and girlfriend to be terminated. In fact, on Christmas of 1990, defendant purchased Christmas gifts for Michelle.

Michelle's mother, Cheryl Brueckmann, testified that Michelle's engagement to defendant lasted for approximately one year. Prior to becoming engaged, Michelle and defendant had been "going together" for a couple of years. Although the engagement was terminated in the summer of 1990, the couple continued seeing each other.

Noel Garcia testified that he had known defendant for about ten years; he used to "hang out" with him. During that time, Garcia saw defendant almost every day. Garcia was also best friends with Anthony Cole and he knew Michelle. According to him, as of January 3, 1991, Michelle and defendant were continuing to date.

At sentencing, Garcia testified that in August of 1990, he dated Michelle for a couple of days. On one of their dates, Garcia and Michelle attended the Pan American Fest with Anthony Cole and Dawn Juarez. On the following day, Garcia and defendant went for a drive with Anthony and Darrio Ramirez. After dropping off Anthony, Garcia, Ramirez and defendant continued driving until they reached a dead-end street by the Chicago River. They parked and began to drink a little.

While the three were together, and as Darrio stood watching, defendant tied up Garcia and began kicking him in the face and punching him. Defendant then broke a bottle, put it to Garcia's neck and told Garcia that he was going to kill him because he had been with Michelle. Darrio intervened and Garcia subsequently passed out.

As a result of the beating, Garcia sustained a fractured nose and a scarring injury under his left eye. Garcia did not identify defendant to police investigators as his attacker. Instead, he told the police that he had been jumped by some "gang bangers."

Anthony Cole also testified that he and defendant had been friends for about 15 years, seeing each other almost every day. At the time of Michelle's death, Cole had known Michelle, as a friend, for about five years. Cole testified that he and Michelle dated for about one month before she was killed.

Cole further testified that on January 2, 1991, defendant approached him at his home and asked if he had been seeing Michelle. Cole denied seeing her; however, he was dating her and, in fact, Michelle had spent the night at Cole's house.

Cole subsequently called to Michelle to come out of the house and to join him and defendant. Michelle joined them and the three subsequently entered Cole's car with defendant riding alone in the back seat. Cole then proceeded to drive defendant home. Prior to arriving at defendant's house, defendant jumped into the front seat with a butcher knife. A struggle ensued and, as a result, Cole received a cut on his hand. Cole stopped the car, he and defendant jumped out, and defendant chased Cole around the car. According to Cole, defendant threatened then that if he saw Cole and Michelle together again, he would kill Cole.

Michelle sustained a cut on her hand as a result of this incident. Cole left the area and summoned the police. The police responded and recovered the knife. Cole took Michelle to the hospital for treatment; he, however, received no medical attention for his injury. There were no arrests as a result of this incident.

The next day, upon seeing Cole and Michelle together again, defendant shot and wounded Cole and fatally wounded Michelle.

There is also testimony that defendant had previously physically assaulted Michelle. On one occasion in particular, defendant beat Michelle, then held a gun to her head and pulled the trigger. He threatened that if he could not have her then no one else would. Fortunately, the gun had no bullet in the chamber which was fired.

As is apparent from these accounts, the recurring theme in each episode which led up to Michelle's death is defendant's jealous anger over what defendant perceived to be a "love triangle" involving him, his girlfriend and his best friends. The seriousness of these episodes is evident. However, and while I do not mean to diminish that seriousness, the particular people involved as well as the time frame in which these incidents occurred cannot be ignored. Given the dynamics in this case, I find death an inappropriate sentence.

Incidentally, Dr. George Savarese, a licensed clinical social worker, testified that Michelle's murder resulted from an explosion of defendant's underlying rage, following defendant's perceived rejection and betrayal by his best friends.

My colleagues would rightfully assert that a sentencing judge's sentencing determination is to be afforded much deference and that altering a defendant's sentence must be approached cautiously and with the utmost circumspection. These are established and highly valued principles to which I most assuredly adhere. However, they are just that, principles. And, although they guide us in our review, when warranted, they cannot preclude a decision to alter what is an inappropriate sentencing determination.

Defendant testified that he always believed that he and Michelle were "going together." The testimony of Michelle's mother and of Garcia lend credence to his testimony. This then is clearly a case in which the de-

fendant was unable to appropriately manage the loss of his exclusive relationship with Michelle. Defendant's problem with managing this loss was merely exacerbated by the fact that the parties who became romantically involved with Michelle were defendant's closest friends.

Notably, this defendant had no juvenile criminal history until the age of 17, at which time he was convicted of aggravated battery. Except for those events, which appear to have been motivated by defendant's anticipated loss of his exclusive romantic relationship with Michelle, the record does not evidence an ongoing pattern of depraved or violent conduct.

The circumstances surrounding these unfortunate incidents were uncontrolled passion and jealous anger. Without question, this defendant should be punished for his terrible deeds. However, unless we carefully sift together all of the facts, all of the circumstances, and all of the dynamics which combine to bring about the commission of a particular offense, we risk, as in this case, a nondiscriminating application of what should be a most discriminately applied punishment—death.

As a final matter, I note my agreement with Justice Nickel's dissent on the issue of the alleged *Batson* violation. I cannot concur in the majority's characterization of the State's proffered explanation as "merely descriptive." There were only two venirepersons requiring distinction for the court. One was a Caucasian male and the other an African-American male. As between the two, the only necessary and identifying distinction was race. "Merely descriptive," then, would have been "the black man." The State's unnecessary characterization of the African-American venireperson—"*You saw* he was *a* black man with red hair"—though not dispositive, certainly suggests the occurrence of a *Batson* violation. So colorful a characterization not only invites, but war-

rants, a closer look. I therefore also join Justice Nickel's dissent.

JUSTICE NICKELS, also dissenting:

Normally the first step of the *Batson* inquiry into a claim that the prosecution has exercised peremptory challenges in a racially discriminatory manner is to determine whether the defendant has established a *prima facie* case of racial discrimination. *Purkett v. Elem*, 514 U.S. 765, 767, 131 L. Ed. 2d 834, 839, 115 S. Ct. 1769, 1770-71 (1995). However, when the prosecution volunteers its race-neutral explanation for excusing a challenged venireperson before the trial court's determination that the defendant has established a *prima facie* case of discrimination, the question of whether the defendant has satisfied step one of the *Batson* inquiry is rendered moot. *People v. Hope*, 168 Ill. 2d 1, 19 (1995), citing *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991).

In the instant case, defense counsel raised a *Batson* objection to the prosecution's exercise of a peremptory challenge against venireperson Martin. In response, the prosecution first asserted that it was not required to give reasons for the challenge until a *prima facie* case had been established. Nevertheless, prior to the trial court's determination regarding the *prima facie* case, the prosecution volunteered to the court that: (1) Martin was an African-American with red hair (2) who was not satisfied with the outcome of several cases and (3) that it was obvious from the situation why Martin was excluded.

This court has held that "[o]nce the prosecutor offers a race-neutral basis for his exercise of peremptory challenges, it is the trial court's duty to determine if the defendant has established purposeful discrimination." *People v. Kitchen*, 159 Ill. 2d 1, 19 (1994), citing *Batson v. Kentucky*, 476 U.S. 79, 98, 90 L. Ed. 2d 69, 88-89, 106

S. Ct. 1712, 1723-24 (1986); see also *Purkett*, 514 U.S. at 767, 131 L. Ed. 2d at 839, 115 S. Ct. at 1770-71 (if a race-neutral explanation is tendered by the prosecution, the trial court must decide whether the opponent of the strike has proved purposeful discrimination). Therefore, because the prosecution here offered race-neutral reasons for its peremptory challenge of Martin, the question of whether a *prima facie* case had been established was rendered moot and the trial court was required to rule upon the ultimate issue of discrimination. Instead, the trial court found only that a *prima facie* case had not been established.

Even though the issue had been rendered moot, the majority, nevertheless, upholds the trial court's finding that a *prima facie* case had not been established. However, the proper analysis of cases in which the *prima facie* question is rendered moot is to review the trial court's findings regarding the legitimacy of the prosecution's race-neutral reasons. See *Hope*, 168 Ill. 2d at 19-21; *Kitchen*, 159 Ill. 2d at 19; *People v. Mitchell*, 152 Ill. 2d 274, 289 (1992). In the instant case, the trial court made no findings as to the reasons offered by the prosecution.

The legitimacy of the prosecution's race-neutral reasons is generally a factual matter determined by the trial court because the trial judge is in the best position to observe the demeanor of potential jurors and then evaluate prosecutive explanations for peremptory challenges. *Mitchell*, 152 Ill. 2d at 296; see also *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869, quoting *Wainwright v. Witt*, 469 U.S. 412, 428, 83 L. Ed. 2d 841, 854, 105 S. Ct. 844, 854 (1985). In addition, after the prosecution offers reasons for its peremptory challenges, the defense counsel is then allowed an opportunity to rebut the prosecution's reasons as being pretextual. *Mitchell*, 152 Ill. 2d at 288. However, in the

102

instant case the trial court affirmatively prevented defense counsel's attempts to develop rebuttal evidence.

Because the establishment of the *prima facie* case was rendered moot, the trial court should have allowed defendant an attempt to rebut the prosecution's explanations as pretextual and completed the *Batson* analysis. For the foregoing reasons, I would remand the cause to the trial court for further proceedings pursuant to *Batson*. Therefore, I respectfully dissent.

JUSTICE FREEMAN joins in this dissent.