THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
CLARENCE JOHNSON, Defendant-Appellant.

First District (6th Division) Nos. 1—87—1258, 1—87—2566 cons.

Opinion filed November 27, 1989.

Randolph N. Stone, Public Defender, of Chicago (Hugh Stevens, Assistant Public Defender, of counsel), for appellant.

Cecil A. Partee, State's Attorney, of Chicago (Inge Fryklund and Lacoulton Walls, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE EGAN delivered the opinion of the court:

The defendant, Clarence Johnson, and Enrique Acosta were charged separately with unlawful delivery of less than 10 grams of cocaine. Their cases were consolidated and were tried together in a

bench trial. Acosta was discharged at the close of the State's case. The defendant was convicted at the close of all the evidence and sentenced to 30 months' probation. On the State's motion the sentence was modified to three years' imprisonment to comport with the statutory sentencing guidelines for defendants who had previously been convicted of felonies. The only issue is whether the defendant was proved guilty beyond a reasonable doubt.

The State's principal witness was Theodore Rizo, a narcotics agent for the Illinois Department of State Police. He testified as follows:

At approximately 3 p.m. on August 10, 1984, he drove to the Contina Tavern at 1900 West Cullerton Street in Chicago, Illinois, where he planned to purchase some cocaine. He was wearing civilian clothes and drove an undercover vehicle. Angel Luna, an informant, was with him. Approximately 11 other agents were in the vicinity of the tavern maintaining surveillance.

Luna entered the tavern while Rizo remained in the car. After a few minutes Luna returned alone; they had a conversation; and Rizo sent Luna back into the tavern to tell Enrique Acosta that Rizo wanted to speak with him. Acosta came out and spoke to Rizo through an open window on the passenger side of a car. Acosta asked Rizo if he was ready to buy some cocaine; Rizo said that he was and that he preferred a delivery early that evening. Acosta left to make a phone call, returned a couple of minutes later and instructed Rizo to come back around 5:30 p.m. Rizo told Acosta that he would call at that time and left.

Rizo called Acosta at about 5:20 p.m. that same day and asked if "it was ready." Acosta said that it was not ready and asked Rizo to call back in 10 minutes. Rizo called back and had a conversation with a woman but not with Acosta. He called again at 6 p.m. and spoke with Acosta, asking if "it was ready." Acosta said it was and instructed Rizo to go to the tavern. When he returned to the tavern he was to purchase 1.5 kilograms of cocaine for $61,000 cash. However, he did not have the cash with him.

Rizo and Luna drove in separate cars to the tavern at 7:30 or 7:50 p.m. Rizo again instructed Luna to go into the tavern. Luna entered the tavern and returned alone a couple of minutes later. Rizo and Luna had a conversation, and Luna went back into the tavern. Luna returned to the car with Acosta and the defendant. Luna stood by the right headlight of the car, while Acosta and the defendant approached the open passenger window. Acosta leaned in the window and said to the defendant, "This is Ted [Rizo]"; the defendant then leaned in,

shook Rizo's hand and said, "Hi, I am Clarence."

Although he had been to the tavern 7 to 10 times before this meeting, Rizo had never spoken with the defendant before, either in person or by telephone. He had spoken only with Luna and another individual who had acted as a "go-between" in the past.

Rizo asked the defendant if "it was ready." The defendant said, "I am sorry; it is not ready. I don't know where my man is at. He was supposed to be here at the tavern." Rizo said that he could not wait and was going to leave. The defendant again apologized for the delay and said, "This man is in Wisconsin and he is prompt." Rizo again said he was leaving; and the defendant said, "Well, if you can't wait around a little bit, I can go to my house and get you an eighth or quarter ounce of pure cocaine."

Rizo said that he was at the tavern to do business and that, if the defendant was not ready, he would leave. The defendant said, "Don't go empty-handed. Let me get you some of what my people are moving for me" and indicated toward the tavern. Rizo told the defendant, "Fine. I will take that, but I'll also want to get your telephone number so I can get ahold of you."

The defendant entered the tavern and returned to the car one or two minutes later. He leaned through the passenger window and handed Rizo eight paper packets. He told Rizo, "there should be an eighth in there." He also handed Rizo a piece of paper bearing the name "Clarence," the word "tavern" or "tav" and a telephone number. Rizo recognized the telephone number as that of the Contina Tavern. He told the defendant that he was in a hurry and that he would be back in contact with the defendant. Rizo left.

He conducted a field test on the contents of the eight packets, detecting the possible presence of cocaine. He inventoried the packets, placed them in a heat-sealed evidence envelope and "subsequently [two weeks later]" delivered the packets to the State laboratory in Joliet for analysis.

He testified to the names of six of the surveillance agents at the tavern, including his superior, and said that there were about five more agents whose names he could not recall. He did not know the exact location of the agents when the defendant handed him the packets. He admitted that Luna was present when the defendant handed him the packets. Although the defendant had given Rizo a phone number, Rizo did not call the defendant back that evening, and the defendant never made any deal with Rizo or gave him any other drugs.

The parties stipulated to the testimony of Devendra Trivendi, a

State forensic scientist: On August 24, 1984, she received two heat-sealed envelopes from Agent Rizo, one of which contained eight packets having a total weight of 1.3 grams of white powder, which she analyzed and concluded was cocaine.

The State rested and both defendants moved for discharge. The judge denied the defendant's motion but allowed the motion of Acosta without expressing any reason for his ruling. Apparently the charge against Acosta was based on the theory of accountability.

The defendant was the only witness for the defense. He testified as follows:

He had talked to Luna at the tavern three or four times over the one- or two-month period before August 10. On numerous days Luna, whom he knew only as "Angel," came into the tavern and talked with everyone inside, sometimes 20 or 30 people. He would also buy drinks for everyone. On occasions when the defendant visited the tavern after school, Luna would approach the defendant and buy him drinks. They talked about "women, whatever men talk about" and then Luna would steer the conversation toward drugs. Luna never talked about meeting with others, but only about Luna buying drugs from the defendant. The defendant thought that Luna was a drug dealer looking for merchandise and told Luna that he did not want to be involved with drugs anymore. He admitted that he had been convicted for a drug violation in 1978.

On August 10 he was in the tavern when Luna came in and bought him a drink. Luna told him that friends of the defendant were outside and wanted to see him. The defendant asked who was outside. Luna started walking to the door of the tavern, and the defendant followed him outside. When outside, the defendant saw a man, whom he did not recognize, wave to him from a car. At some point Luna told the defendant that this concerned drugs, and the defendant again told Luna that he no longer wanted anything to do with drugs. The defendant returned to the tavern. He had never seen nor talked to the man in the car before. He did not talk to the man in the car that night, nor did he give the man any cocaine. He had never talked to Luna about meeting the man. He thought that Rizo was the man he saw in the car.

After the defendant returned to the tavern, he looked out the doorway and saw Luna talking to the man in the car. Luna handed the man something, which the defendant could not see clearly enough to describe.

The defendant was arrested on December 2, 1985, almost 16 months after August 10, 1984. (Rizo swore to the complaint and a

warrant was issued on November 18, 1985.) Rizo had called the defendant's ex-wife, told her to contact the defendant and tell him to surrender himself on drug charges. The defendant called the police station and talked with another agent because he could not reach Rizo. The other agent told the defendant that he could spend Thanksgiving with his family and to come in the following Monday. On Monday, December 2, the defendant went to the police station and met Rizo, who took him back to a small office. Rizo said, "We [can] do this one of two ways. Either you can work for us and bring us in some individuals or you can get in this cage." He knew of no reason for Rizo to pick on him other than that Rizo "want[ed] a stool pigeon."

The State's rebuttal established the defendant's previous convictions for aggravated assault and possession of a controlled substance in 1978, for which he was sentenced to four years' imprisonment; and a conviction of unlawful use of weapons in 1980 for which he was sentenced to 27 months' imprisonment. Rizo was not called in rebuttal.

Before trial, the State filed an answer to a discovery motion and identified "Angel Luna" as a possible witness. The defendant filed a motion for pertinent information about Luna and to produce Luna at hearings on motions and at trial. The motion asked in the alternative for an order dismissing the charge with prejudice should the State refuse to produce Luna. No order expressly ruling on that motion appears of record. On June 17, 1986, at a hearing on the motion, the judge asked for a response to the motion and for a hearing on the application of *Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623. The judge said he would like a hearing to determine whether or not there was "participation by the informant."

On November 17, the defendant's attorney told the court, "The last time it was indicated [the State] didn't want to produce the informant for this small of a case, and the State was supposed to talk to [Rizo]." The matter was continued to November 24. On that date, the attorney for the defendant addressed the court as follows:

> "Right, and *you granted the motion to produce informant*, Your Honor. I spoke to the assistant State's Attorney, Eddie Hansen was the last one I spoke to with respect to this, and he had indicated that he spoke with Agent Rizo, which indicated that it was their position that they did not want to produce their informant for whatever reasons, I am not sure. I don't know what the status is now." (Emphasis added.)

The judge was informed that Luna was a "transactional informant"; and he later said, "Rizo is not going to decide the case, who's going to produce the informant and who's not." He also said, "Somebody

named Rizo is not going to make that decision."

In his post-trial motion, the defendant contended that the court "erred in not dismissing the indictment for failure to produce the informant for interview as the court previously ordered." He also said that the court "erred in not requiring the informant to be produced for trial as requested by the defense."

■ The first question to be addressed is the effect of the failure to call Luna. The defendant's argument on this point is restricted to the contention that the State's proof was insufficient, and he asks only for reversal. He does not assign as error, as a matter of law, the judge's denial of his motion for a new trial for failure to call Luna. See *Roviaro v. United States* (1957), 353 U.S. 53, 1 L. Ed. 2d 639, 77 S. Ct. 623.

A case cited by both sides is *People v. Guido* (1962), 25 Ill. 2d 204, 184 N.E.2d 858. In that case the supreme court affirmed the conviction for a narcotics offense even though the informant was not called to testify. The supreme court said this:

> "It is next urged that the failure of the prosecution to call [the informer] as a witness raises an inference that his testimony would have been unfavorable and thus creates a reasonable doubt of defendant's guilt. The prosecution, however, is not obligated to call an informer as a witness, nor does the failure to do so create a reasonable doubt of guilt. (*People v. Aldridge*, 19 Ill. 2d 176.) *It is only where there is an unexplained failure to call such a witness that an unfavorable inference may arise,* (*People v. Strong,* 21 Ill. 2d 320,) and the testimony here was that [the informer's] whereabouts were unknown. Cf. *People v. Morrison,* 23 Ill. 2d 201." (Emphasis added.) *Guido,* 25 Ill. 2d at 209.

The absence of Luna, who allegedly was present when the defendant handed Rizo the narcotics, is unexplained and, therefore, an unfavorable inference arises, as a matter of law, that his testimony would be unfavorable to the State.

We turn now to the lapse of time between the alleged act on August 10, 1984, and the filing of the charges against the defendant on November 18, 1985. The question before us is whether the lapse of time may be considered in determining the credibility of Rizo. Whether the lapse of time constituted a denial of due process is not before us. (See *People v. Lawson* (1977), 67 Ill. 2d 449, 367 N.E.2d 1244.) In a number of cases convictions were upheld even though a lapse of time existed between the time of the alleged criminal act and the accusation against the defendant. (*People v. Guido* (1962), 25 Ill.

2d 204, 184 N.E.2d 858; *People v. Peyton* (1962), 25 Ill. 2d 392, 185 N.E.2d 163; *People v. Parson* (1963), 27 Ill. 2d 263, 189 N.E.2d 311; *People v. Luckett* (1962), 24 Ill. 2d 550, 182 N.E.2d 696; *People v. Hatch* (1964), 49 Ill. App. 2d 177, 199 N.E.2d 81.) In *Guido*, the lapse of time was 3½ months, but the testimony of the principal narcotics agent was corroborated by the testimony of another agent, and the principal agent testified he delayed the arrest because he contemplated further purchases from the defendant. In *Peyton*, the lapse of time was 50 days. The defendant, however, admitted delivery of a package to the agent but denied knowledge of its contents. The agent testified that the reason for the delay in arresting the defendant was that he was conducting other investigations which would be threatened by the arrest of the defendant. In *Parson*, the lapse of time was five months and the testimony of the principal agent was corroborated by the testimony of two other agents. In addition a statement by a co-conspirator incriminating the defendant was admitted into evidence. The agent testified that they kept the defendant under observation during the time in question. In *Luckett*, the lapse of time was one day. A police officer testified that the defendant made an oral confession to him. The principal officer explained the delay by saying that he did not want to reveal his identity as a police officer at that particular time and place. In *Hatch*, the lapse of time was two months. The informant testified corroborating the police officer in the principal details. Moreover, the defendant himself testified that he was present when the narcotics were delivered but that the money was given to the informant. His principal defense was entrapment. The principal agent testified that the reason for the delay was that he left on vacation soon after the incident; that after his vacation he was on military leave; and that upon his return he believed that the defendant was hiding out on a "shop-lifting rap."

The facts of those cases are in sharp contrast to the facts in this case. There is a time gap of one year and four months in this case, almost four times longer than any of the other cases; there is no corroboration here; and there is no explanation for the excessive delay between the act and the accusation.

■ It is our judgment that the evidence fails to establish the defendant's guilt beyond a reasonable doubt. To summarize, the record fails to show why Luna was not produced for an interview, as the judge had ordered, and why Luna was not called at trial. Rizo never explained the absence of what would have been strong corroboration of his testimony: the slip of paper in the defendant's handwriting he allegedly received from the defendant. Rizo never explained the lapse

of two weeks between the time he allegedly received narcotics from the defendant and the time he brought the narcotics to the crime laboratory. In closing argument the prosecutor said that it was probable and likely that the other officers saw the "manner in which the delivery took place"; but he never explained the failure to produce any of the other 11 agents who were part of the surveillance team. Rizo failed to explain why he waited from August 10, 1984, until November 18, 1985, before he filed any charges. Although not of the same impact as the failure to explain the absence of the witness, the lapses in time and the absence of the physical evidence, the unrebutted testimony of the defendant that Rizo threatened to bring charges against him unless he became an informant is another circumstance to be considered in weighing the credibility of Rizo. *People v. Quintana* (1968), 91 Ill. App. 2d 95, 234 N.E.2d 406.

The judge said he was deciding the case on "credibility"; but, if he was deciding it on credibility and he believed Rizo, we do not understand why Acosta was acquitted. Rizo's testimony, if believed, established Acosta's guilt as a co-conspirator. Rizo said that Acosta asked him if he was ready to purchase cocaine and instructed him to come back later. Rizo had other incriminating conversations with Acosta, and it was Acosta who allegedly brought the defendant to Rizo.

■ The credibility of the witnesses in a case tried without a jury is for a trial judge to determine, but his finding, although entitled to great weight, is not conclusive; a reviewing court will reverse a conviction if the evidence is so unsatisfactory as to raise a reasonable doubt of the defendant's guilt. (*People v. Pellegrino* (1964), 30 Ill. 2d 331, 196 N.E.2d 670.) We repeat the observations of this court in *People v. Quintana* that we do not know whether the defendant was engaged in the sale of narcotics, "but we do know that in this case the testimony of the police officer is suspect and that his uncorroborated testimony is insufficient to prove the defendant guilty beyond a reasonable doubt." (*Quintana*, 91 Ill. App. 2d at 99.) The judgment of the circuit court is reversed.

Judgment reversed.

McNAMARA, J., and LaPORTA, J., concur.