# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Harden*, 2011 IL App (1st) 092309

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LEARTHUR A. HARDEN, Defendant-Appellant. |
| District & No. | First District, 2d Division<br>Docket No. 1–09–2309 |
| Filed | June 7, 2011 |
| Rehearing denied | July 6, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant's conviction for unlawful possession of a controlled substance with intent to deliver was upheld over his contentions that the testimony of the arresting officers was implausible, contradictory and refuted by more credible evidence, that the chemist who tested the seized substance may have improperly commingled the substance before testing, that the trial court erred in allowing his impeachment with a prior conviction and that he was entitled to two more days' credit for his presentence incarceration, since the jury reasonably concluded that the officers' testimony on the relevant issues was credible, the chemist's testimony justified the jury's conclusion that a sample of the substance from each of the 20 packages was tested and that the combined weight of the substances, 1.2 grams, tested positive for cocaine, the mere fact that defendant's prior was offense identical to the charged offense did not preclude its use for impeachment, after balancing its probative value against its prejudicial effect, could be used for impeachment, and based on the State's agreement, the mittimus was corrected to reflect two additional days of presentence credit. |

| | |
|---|---|
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 07–C6–61780; the Hon. Brian Flaherty, Judge, presiding. |
| | |
| Judgment | Affirmed; mittimus corrected. |
| | |
| Counsel on Appeal | Michael J. Pelletier, Alan D. Goldberg, and Deborah K. Pugh, all of State Appellate Defender's Office, of Chicago, for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Eve Reilly, and Whitney Bond, Assistant State's Attorneys, of counsel), for the People. |
| | |
| Panel | JUSTICE HARRIS delivered the judgment of the court, with opinion. Presiding Justice Cunningham and Justice Karnezis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Learthur Harden, was convicted after a jury trial of possession of a controlled substance with intent to deliver 1.2 grams of cocaine. The trial court sentenced Harden to 14 years' imprisonment as a Class X offender. On appeal, Harden contends: (1) the State did not prove him guilty beyond a reasonable doubt where the officers' testimony was implausible, contradictory, and refuted by more credible evidence; (2) the State failed to prove him guilty of possessing more than 1 gram but less than 15 grams of cocaine with intent to deliver, where the chemist did not testify that he tested all 20 bags and may have improperly commingled the substances before testing; (3) the trial court erred in allowing the State to impeach him with a prior conviction for possession with intent to deliver a controlled substance; and (4) he is entitled to two days of sentencing credit.[1]

¶ 2                                    JURISDICTION

¶ 3    The trial court sentenced Harden on August 19, 2009, and he filed a timely notice of

_____

[1]Initially, Harden argued he was entitled to three days of credit. Harden now agrees with the State that he should not be given credit for the day he was sentenced. Therefore, Harden contends in his reply brief that he is entitled to two days' credit.

appeal on August 27, 2009. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution and Illinois Supreme Court Rules 603 and 606, governing appeals from a final judgment of conviction in a criminal case entered below. Ill. Const. 1970, art. VI, § 6; Ill. S. Ct. R. 603 (eff. Oct. 1, 2010); R. 606 (eff. Mar. 20, 2009).

¶ 4                                                BACKGROUND

¶ 5        At Harden's trial, Lieutenant David Basile testified for the State. Lieutenant Basile stated that he has been a Chicago Heights police officer for almost 21 years, the last 15 years in the tactical units conducting narcotics investigations. Lieutenant Basile testified that 75% of his felony arrests were cocaine-related. Over defense counsel's objections, the court qualified Lieutenant Basile as an expert witness in narcotics field investigations.

¶ 6        On the evening of October 4, 2007, Lieutenant Basile worked as a surveillance officer in an operation targeting drug dealers. As a visual aid, he used a pair of "military high-spec, low-light binoculars" that aids vision when external light is low. Lieutenant Basile testified that he has used these binoculars in his narcotics work for the past eight years. On that evening, Lieutenant Basile set up surveillance in the area of Fifth Avenue in Chicago Heights. There were three or four working light posts on the street. He parked his unmarked car across the street, at a 45-degree angle from a house located at 1321 Fifth Avenue. Lieutenant Basile testified that from this vantage point, he could clearly see the house at 1321 Fifth Avenue as well as the side of the house. No fences or other houses obstructed his view. Approximately 10 minutes later, he observed a male walk into the alley adjacent to 1321 Fifth Avenue, with a female following him. The distance between Lieutenant Basile and the male was 100 feet. Lieutenant Basile identified Harden as the male he observed walk into the alley.

¶ 7        Using the binoculars, Lieutenant Basile saw the female hand Harden a piece of paper that appeared to be United States currency. Harden took the money and ran to the southeast rear of the house where there was a three-foot-tall pillar. He leaned down and picked up a plastic bag from the ground, took out several items before setting the bag down, and ran back to the female. Harden then handed her the items from the bag. Lieutenant Basile testified that he never lost sight of Harden during the entire transaction. After the female left, Harden came out of the alley and walked in front of 1321 Fifth Avenue. Another male approached him and handed Harden some money. Harden put the money in his pocket, ran to the side of the building by the pillar, leaned over, and pulled some items out of the bag that was on the ground. Harden returned to the front yard and handed the male the items. After the male left, no one else was in the area other than Harden.

¶ 8        Based on his experience and training, Lieutenant Basile knew he had just witnessed two narcotics transactions. He radioed fellow officers in the area, informed them that the subject was a black male wearing a blue and white striped shirt, and advised them to detain Harden. Lieutenant Basile never lost sight of Harden the entire time. Less than a minute later, two squad cars came down the street and Detective Cole detained Harden in front of the house at 1321 Fifth Avenue. Lieutenant Basile stated that he could see Detective Cole talking to Harden, and less than a minute later both were on the ground. After receiving information from Lieutenant Basile, Officer Fenimore went to the southeast pillar to retrieve the plastic

bag.

¶ 9    On cross-examination, Lieutenant Basile stated that his undercover vehicle was a 1991 Astro van with tinted windows. Between the alley and 1321 Fifth Avenue was a vacant lot. A "decorator wrought iron fence" separated the lot from 1321 Fifth Avenue. Lieutenant Basile did not know for certain whether there was any shrubbery around the fence. He also stated that although the binoculars allowed him to see details and facial features quite well at night, they did not enable him to see as well as he could during the day. Lieutenant Basile stated that he did not use the binoculars the entire time, and without them, he could not tell whether anyone else was at the rear of 1321 Fifth Avenue. On redirect examination, Lieutenant Basile clarified that the decorator fence had slats wide enough apart so that one could easily see through to the inside.

¶ 10    Detective Cole testified that on October 4, 2007, he was part of the team with Lieutenant Basile conducting a narcotics investigation. After speaking with Basile, Detective Cole went to 1321 Fifth Avenue, where he observed a male wearing a blue and white striped shirt. He identified Harden as the male he saw that night. Detective Cole did not see anyone but Harden at the location. He approached Harden and attempted to conduct a field interview. Harden became "very belligerent" and Detective Cole told him to place his hands on a gated wall in front of 1321 Fifth Avenue. Detective Cole spoke to Detective Fenimore over the radio and then he performed a custodial search of Harden. As Detective Cole moved to squeeze Harden's right pants pocket, Harden "dropped his right hand from the wall immediately." The entire time, Harden was telling Detective Cole that the police needed to find someone else to pick on. Detective Cole felt an object in Harden's right pants pocket which he believed was a knife or a box cutter. As Detective Cole felt the object, Harden dropped his right hand again. Detective Cole told Harden to place his hand back on the wall. He then tried to touch the object again, whereby Harden's hand immediately came down to his right pocket. Detective Cole then "struck him with an open hand in his ear to stun him." He took Harden to the ground and placed him under arrest. Detective Cole testified that after hitting Harden in the ear, he put his foot in front of Harden so that he could use his weight to "trip" him. Detective Cole stated it was necessary to "control [Harden's] hands where he couldn't get to that blade in his pocket." Once he got Harden on the ground, Detective Cole "cuffed" him and removed a box cutter from his right pants pocket. Harden was taken to the Chicago Heights police station, where he asked to go to the hospital. Detective Cole stated that at the time, Harden did not have any obvious injuries. Along with the box cutter, $95 in cash was recovered from Harden.

¶ 11    Detective Fenimore testified that on October 4, 2007, he worked with Detective Cole in a narcotics investigation unit. They received information from Lieutenant Basile that he had just witnessed two hand-to-hand narcotics transactions and that the suspect was wearing a blue and white striped shirt. He and Detective Cole proceeded to 1321 Fifth Avenue, where they encountered a male wearing a blue and white striped shirt. Detective Fenimore identified Harden as the person they encountered. After speaking with Lieutenant Basile, Detective Cole approached Harden and Detective Fenimore went to the southeast rear of the residence toward the porch area. He observed a pillar made of brick, and nearby on the ground, he saw a clear plastic bag containing smaller purple bags. Detective Fenimore conducted a field test on the items in the bag and the results were positive for suspected

narcotics. He further stated that the area around the pillar contained no debris.

¶ 12    On cross-examination, Detective Fenimore stated that nothing was covering the plastic bag on the ground. He testified that he found the bag to the left of, and slightly back from, the pillar "approximately a foot under the porch area." Detective Fenimore stated that when he first got to the location and exited his vehicle, Harden was in the front of 1321 Fifth Avenue.

¶ 13    David Vanwingeren testified that he is a forensic scientist specializing in drug chemistry with the Illinois State Police. He testified as an expert in forensic chemistry. Vanwingeren testified that the evidence package contained 1 clear plastic bag with 20 purple zip bags inside, each containing "a small amount of chunky substance." Vanwingeren then testified as to his testing process:

"Q. Can you explain the process of weighing these items to the jury?

A. I took a disposable weigh dish, placed it on the balance, zeroed out the balance, took all 20 items, placed it onto the balance, and then I got a gross weight of that, and then I took the chunky substance out of each package and placed the packaging back onto the balance getting the weight of the packaging and then just subtracted the weight for a net weight of the chunky substance.

* * *

Q. And what did you determine that that weight was?

A. 1.2 grams.

Q. Now, after ascertaining the weight, did you analyze the chunky substances?

A. Yes, I did.

Q. How many tests did you perform?

A. I performed two tests, confirmatory test and preliminary test.

Q. And could you explain the preliminary test you performed first?

* * *

A. It is a simple color test, and I just took a small amount of chunky substance, placed some of the coloring agent on it. At that point, depending on if there is or is not a drug present, or even what type of drug, a color change will or will not occur ***, and in this case a blue color change happened, which is an indication that cocaine is present.

Q. And after you conducted this preliminary test, what did you do next?

A. Then I ran our confirmatory test, which is I take a small amount of sample, [and] run it on our GCMS ***.

* * *

Q. And what was the result of the GCMS test?

A. It was positive for cocaine.

* * *

Q. And after completing your analysis of this chunky substance in determining the presence of cocaine, what did you do with the evidence?

A. I sealed it back up into some plastic bags and put it back into the original evidence bag and placed it back into my locked storage bins at my desk ***."

After Vanwingeren's testimony, the State rested and Harden moved for a directed finding or directed verdict of not guilty. The trial court denied Harden's motion.

¶ 14    Walter Cole testified for the defense. He stated that he has been friends with Harden for about two years. On the night of October 4, 2007, he and Harden were going to Mike's store when officers stopped them. Mike's store is located on Fifth Avenue. Rayanna Harper, Harden's girlfriend at the time, accompanied them to the store. When they got to the store, Rayanna went inside and Walter and Harden waited for her outside. They decided to leave because Harper was "taking too long in the store." They stood in front of 1321 Fifth Avenue waiting for Harper and talked with some people who were there. Walter stated that about 10 people were out that night. About three minutes later, police cars "[came] up from nowhere" and started searching the 10 people there, including Walter and Harden. The police handcuffed Harden, put him in the car and began searching the house. Officer Cole then told Walter he could leave. Harden told Walter to tell his family what had happened, and Officer Cole told Harden to be quiet. Harden stated that he did not have to be quiet because he knew his constitutional rights. Officer Cole then opened the police car door and "punched [Harden] in the eye." Walter testified that he spoke with state investigator Thomas and told him the same information. He further stated that while he was with Harden, Walter never saw him take money in exchange for an unknown package from a black female or a black male. Harden never went to the back of the house at 1321 Fifth Avenue, nor did he ever handle a plastic bag.

¶ 15    On cross-examination, Walter stated that he first met up with Harden at around 9 p.m. and he was with Harper. He could not recall whether Winston Cole was out that evening. He stated that the police searched six people, including him and Harden. After Harden was arrested, his sisters Winter and Danielle Cole showed up. When Harden was in the police car, Harper was walking out of the store toward them. Walter did not recall that Harden was ever on the ground during his arrest. Walter testified that he never went to the police station to report Detective Cole punching Harden in the eye. When asked about his conversation with state investigator Thomas, Walter could not recall whether he told Thomas that he was with Harden all day on October 4, 2007. On redirect, Walter stated that he did not go to the police about the incident because Harden's family said they would handle the situation.

¶ 16    Winter Cole, Harden's sister, testified that around 8 p.m. on October 4, 2007, she was outside talking to friends when Walter and Harper approached her. Winter then went to Fifth Avenue, where she saw her brother in the police car. Other people were out in the area that evening, so "it was pretty noisy." The window of the police car was down, and Winter asked Harden whether he was alright. Harden told her that he did not do anything and that the police would probably let him go soon. He told Winter to go across the street to wait. Winter testified that a police officer then came and "started cussing us out, telling us to move." Harden told the officer that he was violating their civil rights. As she started walking across the street, Winter heard Harden say "he hit me in the eye." She did not see the police officer actually hit Harden. On cross-examination, Winter stated that she was out for about 15 to 20 minutes before walking over to Fifth Avenue. As she was walking toward Fifth Avenue, she passed her father, Winston Cole, who was walking away from Fifth Avenue to her sister

Danielle's house. Winter testified that Walter and Harper accompanied her to Fifth Avenue, and Danielle arrived at the scene later. Winter stated that she relayed the same information to investigator Thomas when she subsequently spoke to him. Winter did not speak to the Chicago Heights police department about the police brutality suffered by Harden because "we got lawyers for that."

¶ 17      Winston Cole testified that on October 4, 2007, he was in a parking lot down the street from 1321 Fifth Avenue. He had been out for about two hours. He was not sure whether he had seen Harden in the area before the police came because about 25 to 30 people were out that night. He then saw a police car approach Harden and Walter, and the police officers began talking to them. They handcuffed Harden, and let Walter go. Winston stated that "the black police officer hit [Harden]." He testified that he was in the area for the entire incident. Winston gave the investigator the same information that he testified to in court. On cross-examination, Winston stated that when the police pulled up to Walter and Harden, they were the only ones in front of 1321 Fifth Avenue, and they were "the only people I saw the police detaining. I didn't see anyone else." While Harden was being arrested, Winston stated that he never saw Harden on the ground. He testified that he saw the police "being pretty rough and hit [Harden]" when he was in the back of the police car. After the police left the area, Winston walked to his daughter Danielle's house. Winston stated that he did not see Winter or Danielle or Harper outside when Harden was arrested. Winston never informed the police department or the State's Attorney's office of the alleged police brutality against Harden. On redirect, Winston stated that he did not know if there were other people in front of 1321 Fifth Avenue at the time.

¶ 18      Rayanna Harper testified that on October 4, 2007, she was Harden's girlfriend. She stated that she was with Harden most of the day but that he helped someone remodel a house on Fifth Avenue. That evening, Harper "mingle[d]" with others in the neighborhood. She went to Mike's store with Harden's sister Winter while Harden went his separate way. Harper testified that she looked across the alley and saw Harden walking because "it is very open on Fifth Avenue." She did not see anyone with Harden. Harper went inside the store, and two minutes later they walked out and saw Harden in the police car. They tried to approach the police car to find out what had happened, but the police officers told them "to keep walking." As they walked, they saw a police officer "hit [Harden] in the eye."

¶ 19      Learthur Harden testified in his own defense. He stated that on October 4, 2007, at 7 or 8 a.m., he went to work with Parish X at the Final Call. Parish was working on a house down the street from Mike's store. Harden testified that he worked 12 or 13 hours that day. After work, he went to Danielle's house because his one-year-old son was there. Harper, Winter, Danielle, and Harden's stepfather were all at the house. Harden stated that he changed his shirt, then left with Harper and Walter to go to the store for milk and Pampers. He was wearing a darker flannel shirt. When they got to the store, Harden saw that it had no milk so he walked back outside. Harper stayed in the store "to buy something to drink." Harden and Walter started walking on Fifth Avenue back to Danielle's house.

¶ 20      As they neared 1321 Fifth Avenue, they passed some people walking toward the store and stopped to talk. There were about six people out in front of 1321 Fifth Avenue. As they talked, a police car pulled up and the officers told them not to move. Four of the six people, including Harden and Walter, were told to "get up against the gate." An officer grabbed

Harden and then made a call on his radio. After the call, the officer placed handcuffs on Harden and put him in the police car. Harden testified that he never resisted arrest and the officers never searched him. After searching the others, the officers let them go. Harden stated that after he was arrested, his sister and Harper came to the police car. One of the officers told them to get away from the car and started "pushing them." Harden told the officer that they had a right to observe what was happening, and Officer Cole told him "to shut the 'F' up." Harden then told the officer that he knew his constitutional rights. Officer Cole opened the police car door, hit Harden in the eye, and "tried to choke [him] out." Harden "started calling [Officer Cole] a bunch of names, called him all kinds of insults."

¶ 21    On the way to the police station, Harden continued to scream at him. When they got to the station, Officer Cole opened the back door, grabbed Harden, took him into the station and threw Harden against the wall. Harden testified that he slid down the wall onto a bench. The police took off his handcuffs and then told Harden to handcuff himself to the rails. When Harden refused, they handcuffed him to the rails. Harden asked for medical help and they called an ambulance. One of the officers took him to St. James Hospital where a doctor treated his eye wound. Harden did not require stitches. When Harden returned to the police station, they took a photograph of him.

¶ 22    Harden testified that he never went to the back of 1321 Fifth Avenue that evening. He denied having any kind of transaction with an unknown female or unknown black male in which he gave a packet in exchange for cash. He had nothing to do with the plastic bag containing packets found in the back of 1321 Fifth Avenue. Harden further testified that a total of around 25 people were out in the area that evening. He did not recall seeing his father or sister Danielle out that evening. Harden acknowledged that he had a prior conviction for possession of narcotics, but that "nothing [was] going to prevent [him] from telling the truth today."

¶ 23    On cross-examination, Harden stated that he could not recall whether he had changed his shirt after coming back from work on October 4, 2007. He went to Danielle's house and then left with Harper and Walter to go to the store. Harden stated that he never was in the alley behind the store and that he and Walter waited for Harper in front of the store. When she came out, Harden and Walter began walking toward 1321 Fifth Avenue. Harper was behind them, but not walking with them. When the officers pulled up to them, "[t]hey jumped out of their car and said don't move." Officer Cole had his gun drawn. The police told four of the six people in front of the house to put their hands on the wall. Harden stated that the police recovered a box cutter and $95 from his person. On redirect, Harden stated that he used the box cutter in his remodeling work.

¶ 24    In rebuttal, the State called Joseph Thomas as a witness. Thomas testified that he was employed by the Cook County State's Attorney's office as an investigator. An investigator interviews witnesses in cases coming before the court. Thomas stated that he interviewed several witnesses in connection with Harden's case. One witness was Walter Cole. Thomas contacted Cole on January 16, 2009, and asked him about the events of October 4, 2007. Cole told Thomas that he was with Harden for several hours before Harden's arrest. He never stated that the police searched him or that Harden had been beaten and punched while he sat in the back of the police car. Thomas also interviewed Winter Cole on February 24, 2009. Winter stated that Winston was not present when Harden was arrested, and she did not state

that Harden was punched and beaten while in the police car. On cross-examination, Thomas stated that he never explicitly asked Walter whether he had been searched by the police, nor whether the police punched Harden. He also did not ask Winter whether her father was present before or after Harden's arrest. However, Walter and Winter did not volunteer any of the information either.

¶ 25     The jury found Harden guilty of possession of a controlled substance and possession of a controlled substance with intent to deliver. Harden filed a motion for a new trial in which he argued for the first time that the State did not prove he had possession of 1.2 grams of cocaine. The trial court denied Harden's motion. After merging the counts, the trial court sentenced Harden to 14 years' imprisonment. Harden filed this timely appeal.

¶ 26                                                    ANALYSIS

¶ 27     Harden's first contention is that the State's evidence was insufficient to support his conviction. When presented with a challenge to the sufficiency of the evidence, this court must determine whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). To establish guilt of the offense of possession of a controlled substance with intent to deliver, the State must show the defendant (1) had knowledge of the presence of narcotics; (2) had possession or control of the narcotics; and (3) intended to deliver the narcotics. *People v. Robinson*, 167 Ill. 2d 397, 407 (1995). Knowledge may be proved by showing that the defendant knew narcotics existed in the place where it was recovered. *People v. Smith*, 288 Ill. App. 3d 820, 824 (1997). Furthermore, evidence that the defendant was aware of, and exercised control over, the drugs can establish constructive possession. *People v. Jones*, 295 Ill. App. 3d 444, 453 (1998). "[W]here the finding of guilt depends on eyewitness testimony, a reviewing court must decide whether, in light of the record, a fact finder could reasonably accept the testimony as true beyond a reasonable doubt." *People v. Cunningham*, 212 Ill. 2d 274, 279 (2004).

¶ 28     At Harden's trial, Lieutenant Basile testified that on the evening of October 4, 2007, he took part in a surveillance operation targeting drug dealers. Using "military high-spec, low-light binoculars" to aid his vision, Lieutenant Basile observed two transactions approximately 100 feet away in front of 1321 Fifth Avenue. In each, a male wearing a blue and white striped shirt received money from a person then ran to a pillar on the southeast rear corner of the house, picked up a plastic bag from the ground and removed several items from the bag. He then ran back to the person with the items. Although it was dark, Lieutenant Basile testified, there were three or four working street lamps in the area, and the special binoculars allowed him to see details and facial features quite well. Based on his 15 years' experience in narcotics investigations, Lieutenant Basile knew he had just witnessed two narcotics transactions.

¶ 29     Detective Fenimore testified that after hearing from Lieutenant Basile, he and Detective Cole proceeded to 1321 Fifth Avenue, where they encountered a male wearing a blue and white striped shirt. He identified Harden as the male in the blue and white striped shirt. As Detective Cole approached Harden, Detective Fenimore went to the southeast rear of the

residence toward the porch area where he observed a pillar made of brick. Nearby on the ground, about a foot under the porch, he saw a clear plastic bag containing smaller purple bags. He stated that the area around the pillar contained no debris. Detective Fenimore conducted a field test on the items in the bag and the results were positive for suspect narcotics.

¶ 30    Detective Cole testified that after communicating with Lieutenant Basile, he and Detective Fenimore proceeded to 1321 Fifth Avenue, where they encountered a male wearing a blue and white striped shirt. He identified Harden as the male they saw that evening; he did not observe anyone else in the area. As Detective Cole attempted to interview Harden, Harden became "very belligerent." Detective Cole asked Harden to place his hands on the wall, and as he searched Harden's right pants pocket he felt something which he believed was a knife or box-cutter. Harden's hand immediately came down. Each time Detective Cole attempted to touch the item in his pocket, Harden's hand came down from the wall. Detective Cole struck Harden on the ear to stun him, then took Harden to the ground by putting his foot in front and tripping him. Detective Cole stated that taking Harden to the ground in such manner was necessary to control his hands. A box cutter and $95 were recovered from Harden.

¶ 31    Forensic scientist David Vanwingeren testified that he received the evidence package containing 1 clear plastic bag with 20 purple zip bags inside. Each zip bag contained "a small amount of chunky substance." The "chunky substances" tested positive for cocaine, and the weight of the substances amounted to 1.2 grams. In the light most favorable to the prosecution, the evidence supports the finding that Harden committed the offense of possession of a controlled substance with intent to deliver beyond a reasonable doubt.

¶ 32    Harden disagrees, arguing that the officers' "implausible" and "contradictory" testimony cannot support his conviction where it was refuted by the defense witnesses' more credible testimony. It is the jury's function to assess the credibility of the witnesses, the weight given to their testimony, and the inferences to be drawn from the evidence. *People v. Tenney*, 205 Ill. 2d 411, 428 (2002). "Testimony may be found insufficient *** only where the record evidence compels the conclusion that no reasonable person could accept it beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 280.

¶ 33    Harden contends it is implausible that Lieutenant Basile could see the rear of 1321 Fifth Avenue at night while parked across the street at a 45-degree angle, especially since a wrought iron fence bordered the property. Also, Harden points to Lieutenant Basile's statement that the plastic bag was on the ground in full view as contradicting Detective Fenimore's testimony that he found the plastic bag about a foot under the porch. Although Lieutenant Basile, Detective Fenimore, and Detective Cole testified that Harden was the only person outside of 1321 Fifth Avenue at the time of his arrest, Harden's witnesses all testified that a number of people were out in the area that evening and as many as 6 to 10 people were outside of 1321 Fifth Avenue at the time of the arrest.

¶ 34    Furthermore, Detective Cole's testimony about his encounter with Harden, that he struck Harden with an open hand on the ear to "stun him" but there were no visible injuries, did not match the evidence. A photograph taken of Harden after his arrest showed an eye injury requiring butterfly stitches. However, defense witnesses' consistent accounts that Detective

Cole struck Harden in the eye after Harden was placed in the police car matched the photographic evidence. Although Harden acknowledges that the testimony of defense witnesses contained contradictions "with regard to minor issues," he contends that it was more credible than the officers' testimony. Harden asks this court to reverse his conviction citing as support *People v. Johnson*, 191 Ill. App. 3d 940, 946 (1989).

¶ 35    *Johnson* is distinguishable from the case at bar. In *Johnson*, the State's principal witness was narcotics agent Theodore Rizo. Rizo testified that he and an informant, Angel Luna, entered a tavern where they planned to purchase cocaine. Approximately 11 other agents were in the area conducting surveillance. *Johnson*, 191 Ill. App. 3d at 941. The court in *Johnson* noted the concerns about Rizo's testimony; that he never explained why he could not produce Luna or any of the other agents as witnesses to corroborate his testimony; why he waited from August 10, 1984, until November 18, 1985, before filing charges; and why there was a lapse of two weeks from the time Rizo allegedly received the narcotics to when he brought the drugs to the crime laboratory. *Johnson*, 191 Ill. App. 3d at 946-47. The court found the testimony of Rizo suspect and held that " 'his uncorroborated testimony is insufficient to prove the defendant guilty beyond a reasonable doubt.' " *Johnson*, 191 Ill. App. 3d at 947 (quoting *People v. Quintana*, 91 Ill. App. 2d 95, 99 (1968)).

¶ 36    Here, although Lieutenant Basile was the only officer to observe the transactions, the portions of his testimony used to prove the elements of Harden's conviction were substantially corroborated by the testimony of Detectives Fenimore and Cole. Whether the jury believed that Lieutenant Basile could actually see the rear of 1321 Fifth Avenue from his parked vehicle, or view the plastic bag that was found under the porch, is a credibility determination. The jury viewed photographs of the surveillance area, saw the vantage point of Lieutenant Basile in relation to 1321 Fifth Avenue, and observed the demeanor of all the witnesses. As such, Lieutenant Basile's statements directly supporting Harden's conviction for possession of a controlled substance with intent to deliver "could reasonably be accepted by the fact finder *** as true beyond a reasonable doubt." *Cunningham*, 212 Ill. 2d at 285.

¶ 37    Detective Cole did testify that he hit Harden only once on the ear, which appears to conflict with the photograph of Harden's eye injury. However, he also testified that he took Harden to the ground by tripping him in order to control Harden's hands. Harden may have received the eye injury depicted in the photograph when Detective Cole forced him to the ground. Nonetheless, when flaws in the testimony exist it is for the fact finder to judge how the inconsistencies affect the credibility of the testimony as a whole. *Cunningham*, 212 Ill. 2d at 283. Despite the contradiction between Detective Cole's account of how he hit Harden and the photograph of Harden's eye injury, the jury could have reasonably found credible the portion of Detective Cole's testimony corroborating Lieutenant Basile's account of the transaction.

¶ 38    Harden also contends the officers' testimony that Harden was the only one in front of 1321 Fifth Avenue that evening was contradicted by defense witnesses' testimony. He argues that the State misstated Lieutenant Basile's testimony during closing argument by claiming that Lieutenant Basile did not say "that there was only one person" on the street. According to Harden, this misrepresentation proves that "it was the defense witnesses–not the officers–who were credible." The number of people on the street when Harden was arrested is collateral to the relevant issue of whether Harden possessed 1.2 grams of cocaine with the

intent to deliver. See *People v. Myles*, 257 Ill. App. 3d 872, 884 (1994). Furthermore, as discussed above, the trier of fact resolves any factual disputes arising from conflicting or contradictory testimony. *People v. Hendricks*, 137 Ill. 2d 31, 65 (1990). A reviewing court must not substitute its judgment for that of the fact finder on issues of the witnesses' credibility and the weight to be given to their testimony. *People v. Evans*, 209 Ill. 2d 194, 211 (2004). As discussed above, the jury reasonably concluded that the officers' testimony on the relevant issues was credible and proved the elements of the offense beyond a reasonable doubt.

¶ 39    Harden next contends that the State did not prove the element of weight beyond a reasonable doubt where Vanwingeren may have improperly commingled the evidence prior to testing and his testimony did not indicate he tested more than one gram of substance. The State argues that Harden has waived this issue for review by failing to object to the evidence at trial. Generally, errors not objected to at trial or raised in a posttrial motion are waived on appeal. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). However, when a defendant challenges the sufficiency of the evidence used to convict him, his claim is not subject to waiver and may be raised for the first time on direct appeal. *People v. Woods*, 214 Ill. 2d 455, 470 (2005). We will address the merits of Harden's argument.

¶ 40    The sentence for possession of a controlled substance with intent to deliver depends on the amount of controlled substance one is found to possess. *People v. Coleman*, 391 Ill. App. 3d 963, 971 (2009). Therefore, "[w]hen a defendant is charged with possession of a specific amount of an illegal drug with intent to deliver and there is a lesser included offense of possession of a smaller amount, *** the weight of the seized drug is an essential element of the crime and must be proved beyond a reasonable doubt." *People v. Jones*, 174 Ill. 2d 427, 428-29 (1996). Random testing of samples in order to infer "the makeup of the substance of the whole" is proper if the seized samples are sufficiently homogenous. *Jones*, 174 Ill. 2d at 429. However, if separate bags or containers of substance are seized, a sample from each bag or container must be tested in order to prove that it contains an illegal drug. *People v. Williams*, 200 Ill. App. 3d 503, 515 (1990). To conclude that the remaining packages also contain a controlled substance amounts to improper speculation or conjecture. *Jones*, 174 Ill. 2d at 430. For the same reasons, commingling the contents of the packages before testing also renders the test results insufficient to support the weight element beyond a reasonable doubt. *People v. Clinton*, 397 Ill. App. 3d 215, 223 (2010).

¶ 41    Harden argues that Vanwingeren's trial testimony never explicitly indicated that he tested all 20 packets for a controlled substance. Harden points to the words Vanwingeren used to describe the weighing and testing process. Vanwingeren testified that he "performed two tests, confirmatory test and preliminary test." For each test, he analyzed "a small amount of chunky substance" or "sample." Harden concludes that Vanwingeren improperly performed only two tests total on a small sample of substance, rather than test each bag for presence of a controlled substance. Harden further argues that Vanwingeren erroneously commingled the contents of all 20 packets before testing because he stated that after testing the substance he "sealed it back up into some plastic bags and put it back into the original evidence bag." Therefore, Harden argues, the State did not prove beyond a reasonable doubt that all 1.2 grams of substance seized actually tested positive for cocaine. As support, Harden cites *Jones*, 174 Ill. 2d 427, and *Clinton*, 397 Ill. App. 3d 215.

-12-

¶ 42　　　Both cases, however, are distinguishable from Harden's case. In *Jones*, the State specified that it selected two of the five packets seized for testing, and that the contents of the remaining three packets were not tested. *Jones*, 174 Ill. 2d at 428. In *Clinton*, the chemist testified that he emptied the contents of six packages onto a scale until the weight reached one gram, then he tested the commingled mixture for the presence of a controlled substance. *Clinton*, 397 Ill. App. 3d at 222. Vanwingeren's testimony here provided no such explicit reference. Viewing his testimony in the light most favorable to the State, it supports the finding that Vanwingeren tested each bag individually for the presence of narcotics.

¶ 43　　　Prior to Vanwingeren's testimony on testing, the prosecutor asked him whether he analyzed "the chunky substance*s*" indicating more than one substance. (Emphasis added.) The following testimony that he performed a "preliminary test and confirmatory test" speaks of a testing method for each substance rather than the specific number of tests Vanwingeren actually conducted. Also, when he described the weighing process Vanwingeren spoke of removing "the chunky substance out of *each* package" before weighing the packaging material. (Emphasis added.) By stating that he removed the substance out of each package, Vanwingeren confirmed that he kept the contents of each package separate and did not commingle the contents of all the packages. We note that defense counsel did not challenge this evidence before trial, nor did counsel object to the evidence when Vanwingeren testified at trial. In fact, defense counsel had the opportunity to cross-examine Vanwingeren on his testimony and never raised the issue. The record may not expressly state whether Vanwingeren tested all 20 bags of "the chunky substance" or whether he commingled the contents before testing. Where the record is ambiguous, however, "we will not presume that an improper procedure was performed." *People v. Miller*, 218 Ill. App. 3d 668, 673 (1991). Where the evidence presented is susceptible to conflicting inferences, "it is best left to the trier of fact for proper resolution." *People v. McDonald*, 168 Ill. 2d 420, 447 (1995). Here, the jury could reasonably conclude from Vanwingeren's testimony that he tested a sample of substance from each package and the combined weight of the substances, 1.2 grams, tested positive for cocaine.

¶ 44　　　Harden's third contention is that the trial court erroneously allowed the State to impeach him with a prior conviction for possession with intent to deliver a controlled substance. A defendant who testifies may be impeached by proof of a prior conviction. *People v. Tribett*, 98 Ill. App. 3d 663, 675 (1981). The trial court may allow evidence of a prior conviction for this purpose where: (1) the prior crime was punishable by death or imprisonment of more than one year, or involved dishonesty or false statement regardless of the punishment, (2) less than 10 years have passed since the date of conviction of the prior crime or release of the witness, whichever is later, and (3) the probative value of admitting the prior conviction outweighs the potential for unfair prejudice. *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971). In determining whether the probative value outweighs the prejudicial effect, the trial court must take into account (1) the nature of the previous crime; (2) the proximity or remoteness in time of the past conviction to the present time; and (3) the similarity of the prior crime to the one charged. *Tribett*, 98 Ill. App. 3d at 675. Harden filed a motion *in limine* to bar the State from introducing evidence of his past conviction for possession of a controlled substance. "[E]videntiary motions, such as motions *in limine*, are directed to the trial court's discretion, and reviewing courts will not disturb a trial court's evidentiary ruling

absent an abuse of discretion." *People v. Harvey*, 211 Ill. 2d 368, 392 (2004).

¶ 45    At the hearing on the motion, the following exchange occurred:

"MR. SORICH [Assistant State's Attorney]: By way of background, Judge, he has a possession with intent conviction from December of 1997. He received ten years Illinois Department of Corrections. That was consecutive to a possession of a stolen motor vehicle conviction, which he was convicted on June of 1997.

\* \* \*

THE COURT: So all we're dealing with is a PSMV, possession with intent. \*\*\*

\* \* \*

MR. SHROEDER [defense counsel]: Judge, the purpose of bringing up that conviction, or one of the effects of bringing up that conviction is to imply to a jury \*\*\* that, well, if he did it before, he did it again. And there's no reason why, there's no allegation that there's anything to do with modus operandi or anything distinguishing about the prior conviction. \*\*\*

THE COURT: *Montgomery* does allow me to do a balancing act to balance the probative effect versus the prejudicial effect. And he [*sic*] certainly these–the PSMV and the possession of a controlled substance with intent to deliver certainly are within the time period of *Montgomery*. I will, however, not allow the PSMV. I will allow the possession of a controlled substance with intent to deliver.

\* \* \*

MR. SHROEDER: But, again, Judge that's a prior bad act. That doesn't fit in with one of the exceptions.

THE COURT: It has nothing to do with–it only goes–it only goes to whether or not he's going to testify. They're allowed to bring that out so the jury can judge his credibility.

MR. SHROEDER: It's extremely prejudicial, and it's not probative of anything. It's not something about his truth and veracity.

THE COURT: I disagree with you."

¶ 46    In *People v. Atkinson*, 186 Ill. 2d 450 (1999), the defendant argued that the trial court erred in allowing his prior convictions where it did not articulate the factors it considered in applying the *Montgomery* balancing test. *Atkinson*, 186 Ill. 2d at 462. The supreme court disagreed, noting that defense counsel specifically referred to the test in his argument against the use of the prior convictions, and the trial court referred to the *Montgomery* test in denying the defendant's motions for a mistrial and a new trial. *Atkinson*, 186 Ill. 2d at 462. The court held that the trial court conducted a proper balancing test under *Montgomery*, and it "did not err in failing to articulate the factors [it] considered" in applying the test. *Atkinson*, 186 Ill. 2d at 463. See also *People v. Williams*, 173 Ill. 2d 48, 83 (1996) (the supreme court found no error where the transcript makes clear that the trial court applied the *Montgomery* test even if it did not expressly state it was balancing the opposing interests).

¶ 47    At the hearing on Harden's motion *in limine*, defense counsel was clearly referring to the *Montgomery* test when he argued that the prejudicial effect of the prior drug conviction far outweighed its probative value. The trial court here, as in *Atkinson*, specifically referred to

*Montgomery* and acknowledged its requirement that the court balance the probative value with the prejudicial effect of the prior conviction. When defense counsel argued that the prior drug conviction is not probative of Harden's capacity for "truth and veracity," the trial court disagreed. Although the trial court here did not articulate how it balanced the probative value of the prior conviction with the prejudicial effect, "there is no reason to suppose that [it] disregarded the familiar, well-established *Montgomery* standard." *Williams*, 173 Ill. 2d at 83. The trial court did not abuse its discretion in allowing the State to use Harden's prior drug conviction to impeach his credibility.

¶ 48    Harden argues that if the trial court properly applied the balancing test in *Montgomery*, it would have admitted his prior PSMV conviction rather than the drug conviction. Harden argues that his prior drug conviction is more prejudicial because it is identical to the present charge against him. Harden also contends that the traditional rationale for admitting drug convictions for impeachment purposes, that they reveal a " 'disposition to place the advancement of individual self-interest ahead of principle,' " was "discredited" in *People v. Williams*, 161 Ill. 2d 1, 38 (1994). *People v. Elliot*, 274 Ill. App. 3d 901, 909 (1995). Instead, the trial court should have allowed the conviction for possession of a stolen motor vehicle as impeachment, since the nature of that offense more directly relates to one's truthfulness.

¶ 49    The mere fact that his prior conviction is for an offense identical to one Harden was charged with does not preclude its use for purposes of impeachment. See *Tribett*, 98 Ill. App. 3d at 676. After balancing the probative value of the prior drug conviction with its prejudicial effect, the trial court here concluded that the drug conviction could be used to impeach Harden's credibility. Our courts have consistently held that a conviction for possession or delivery of a controlled substance is "the type of conviction which would be probative of credibility and would afford a basis for impeaching credibility." *Tribett*, 98 Ill. App. 3d at 675-76. Furthermore, the supreme court in *People v. Williams*, 173 Ill. 2d 48 (1996), disagreed with the *Williams* case cited by Harden to the extent it is construed as leaving eligible for impeachment only those prior "convictions for offenses that involve dishonesty or false statement." *Williams*, 173 Ill. 2d at 83. The *Williams* court reiterated that the State may continue to use, for impeachment purposes, evidence of a prior crime punishable by death or imprisonment of more than one year. *Williams*, 173 Ill. 2d at 83. Therefore, decisions indicating that the "nature of the prior conviction must bear on the witness's truthfulness before it can be considered for use as impeachment are trumped" by *Williams*. *Stokes v. City of Chicago*, 333 Ill. App. 3d 272, 278-79 (2002) (*People v. Elliot*, 274 Ill. App. 3d 901 (1995), cited by Harden, is one such case "trumped" by *Williams*).

¶ 50    Both parties agree that Harden is entitled to two additional days of presentence credit. The mittimus will be amended to reflect the correct amount of credit.

¶ 51    For the foregoing reasons, the judgment of the circuit court is affirmed.

¶ 52    Affirmed; mittimus corrected.